**SMITH ENGINEERING CO. v. RICE.***
**SMITH ENGINEERING CO. et al. v. SAME.**
**In re LAUREL OIL & REFINING CO.**
Nos. 8400, 8401.

Circuit Court of Appeals, Ninth Circuit.
Dec. 17, 1938.

Rehearing Denied March 13, 1939.

---

*Writ of certiorari denied 59 S.Ct. 1034, 83 L.Ed. ——.

Sterling M. Wood, of Billings, Mont., and William H. Hunt and Wallace Sheehan, both of San Francisco, Cal. (Albert I. Beach, of Kansas City, Mo., of counsel), for appellants.

H. J. Coleman, of Billings, Mont., and M. S. Gunn and Carl Rasch, both of Helena, Mont., for appellee.

Marshall Beach, of Kansas City, Mo., for appellants on petition for rehearing.

Charles De Y. Elkus, Tadini Bacigalupi, and Herbert H. Salinger, all of San Francisco, Cal., for appellee on petition for rehearing.

Before GARRECHT, MATHEWS, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

Appeal has been taken from a decree dismissing a suit brought by Smith Engineering Company, a Pennsylvania corporation, hereinafter referred to as the company, to foreclose a mechanics lien on real property in Montana, and from a judgment for plaintiff in an action brought by Laurel Oil and Refining Company, hereinafter called the refiner, against the company and American Surety Company of New York, hereinafter called the surety, to recover damages for breach of two contracts, hereafter called the contract and the supplemental contract, made and entered into by the company and one Will F. Lipman on August 2, 1929.

Because of the conclusion we have reached it is unnecessary to relate evidence and facts pertaining to a number of the questions raised.

Prior to 1910, gasoline was obtained from crude oil by what is known as the "topping process" exclusively. By that process, vapors arising from the crude oil when heat is applied to the same were condensed at atmospheric pressure, and the condensed vapors are referred to as "straight-run" gasoline. Thereafter, a process known as "cracking" was perfected, by which the yield of gasoline from a given crude oil is increased. By that process the part of the crude oil remaining after the straight-run gasoline is separated, is subjected to operations, including a time-temperature and pressure treatment, by which the molecules are broken down and rearranged, resulting in a so-called "synthetic" crude, which also produces gasoline.

It is apparent that vapors arise from the crude oil at low and high temperatures. It became necessary to designate an arbitrary temperature up to which gasoline was obtained by condensation of the vapors arising from the crude oil and temperatures up to the one arbitrarily fixed, called the "end-point". The standard commonly accepted is the one promulgated by the Bureau of Mines, Department of Commerce of the United States. The first specification was issued October 2, 1918, and contained no provision regarding the sulphur content of gasoline. There were many revisions of such specification. A revision in 1924 first contained a provision regarding the sulphur content in gasoline. The specification as revised in 1927 stated that "Gasoline purchased under this specification shall be described as 'U. S. Govern-

ment Motor Gasoline' * * *'" Part of the specification provided:

"6. Distillation Range. Method 100.13. When the first drop falls from the end of the condenser, the thermometer shall not read more than 55 degrees C. (131 degrees F.).

"When 20 per cent has been recovered in the receiver, the thermometer shall not read more than 105 degrees C. (221 degrees F.)

"When 50 per cent has been recovered in the receiver, the thermometer shall not read more than 140 degrees C. (284 degrees F.)

"When 90 per cent has been recovered in the receiver, the thermometer shall not read more than 200 (degrees) C. (392 degrees F.)

"The end point shall not be higher than 225 degrees C. (437 degrees F.)

"At least 95 per cent shall be recovered as distillate in the receiver from the distillation.

"7. Sulphur. Method 520.11. Sulphur shall not exceed 0.10 per cent."

One Will F. Lipman of Portland, Oregon, being engaged in the production of oil, in 1927 and 1928 became interested in the refining of Oregon Basin crude oil. After various inquiries and negotiations he entered into a contract with the company, which was engaged in the business of designing and constructing oil refineries.

The contract was signed on August 2, 1929, by Lipman as trustee for the refiner, which had not then been organized, and by the company's president. It consisted of a contract and a supplemental contract.

By the contract, the company agrees to construct "a complete operating oil refinery to process Oregon Basin crude, otherwise designated as charging stock, for the production of products as specified" therein, near Billings, Montana, for the total sum of $433,845, payable in installments.

The contract provided that the company should "assume all responsibility for the design, construction and operation of the refinery"; that the capacity of the refinery would be: " * * * to handle Fifteen Hundred (1500) barrels (42 gallons) per day of twenty-four (24) hours of the above mentioned charging stock, when operating on a cyclic time efficiency of 90%, it being assumed that the normal charge stock fed to the refinery will be 70° F. or higher, as taken from storage."

It was provided that the yields from the crude oil would be:

"Anti-knock Gasoline, U. S. Motor Specifications, 65%. (This will consist of the natural gasoline contained in the crude, plus the cracked gasoline produced from the topped crude.)

"Residuum of heavy fuel oil—25%.

"Fixed gas loss and fuel oil to operate refinery—10%."

It was also provided that "all material and equipment will be of the best quality and that the entire refinery" would "be designed and constructed in a sound workmanlike manner"; that the complete distillation and cracking unit was of the company's individual design and would be engineered and constructed for its particular service to meet Lipman's requirements, that " * * * the distillation and cracking unit will be built in accordance with the best engineering practice known to the industry and that the remaining units will be built in an entirely sound and satisfactory manner for the character and the work contemplated, and will be so constructed that the routine maintenance and repairs will be maintained at lowest level."

With respect to time, the contract provided that the company " * * * estimates that the complete refinery can be made ready for initial operation in from 150 to 175 working days from the date on which the Purchaser turns over the refinery site clear and ready for the erection of the equipment.

"In the event that during the initial operating period [the company] finds it necessary to make changes or alterations, * * * it is agreed that [the company] shall have a period from 30 to 60 days in order to make the aforesaid alterations and an additional 30 days in which to produce the expected results, if so required by the Purchaser. The cost of any alterations and changes, however, will be borne entirely by [the company] * * *"

It was further provided that Lipman " * * * shall furnish the following items of materials, labor and services: * * *

" * * * All necessary routine operating labor, as well as charging stock and other material required during initial and test runs * * *"

The company guaranteed the following:

" * * * that the capacity of the unit will be 1500 barrels (42 gallons) of clean Oregon Basin crude oil per day of twenty-

four (24) hours, * * * as stipulated [above] * * *

" * * * the yields of the products will be as stipulated [above] * * *

" * * * to produce the yields of products * * * as shown [above], the [company] being permitted a tolerance of plus or minus 5 (five) percent of each product, the percentage being based upon the product as 100%.

" * * * that the refinery as herein specified will be complete in itself and that it will be capable of continuous routine operation, producing stipulated results without the necessity of the expenditure of additional sums of money to produce a complete operating plant."

The supplemental contract provided that the company would construct a "complete fire protection equipment and standby water tower facilities at the proposed refinery" and to provide "coking operation" for the treatment "of a minimum of 375 barrels per day of residuum to asphalt or coke", which would be "a component part of the complete distillation and cracking unit", for the total sum of $48,700 payable in installments. It was provided that "the time of completion and guarantees as to quality will conform to those given in the" contract.

The particular units to be built were a combined topping and cracking unit, a treating plant, and a shell type coking unit. The treating plant was not designed to remove large amounts of sulphur from the gasoline, but was designed to stabilize the gasoline as to color.

Certificate of Incorporation of the refiner was filed in Delaware on October 4, 1929. On October 7, 1929, the company wrote Diescher at Winfield wherein they confirmed a verbal agreement to modify the supplemental contract by substituting in the coking unit "a radiant type high velocity pipe still" for the "conventional shell stills" provided in the supplemental contract. Diescher approved the modification by letter dated October 14, 1929.

On October 14, 1929, Lipman assigned his rights under the contract and supplemental contract to the refiner, which assumed his obligations thereunder. Actual construction of the refinery began about this time. On December 17, 1929, the company and the surety executed a bond to the refiner for the faithful performance of the contract in the total amount of $482,-545. On the same day, the refiner assign-ed the bond to trustees as additional security for a bond issue of the refiners, disposed of by the investment bankers.

Construction work had been practically completed by May 17, 1930. Operations began about that time and continued intermittently until October 25, 1930. The coking unit did not function properly because the tubes were too small and filled up with coke. A temporary installation of larger tubes was made, which improved the operations somewhat, and later a permanent installation of the larger tubes was made.

The gasoline produced contained more than 0.10 per cent of sulphur. The refiner insisted that the excess sulphur be eliminated. The company employed specialists in that field, and constructed at its expense a doctor sweetening plant, which, although it did remove small amounts of sulphur, was primarily designed to stabilize the gasoline as to odor. The refiner also engaged specialists to work on that problem. The net result was that while sulphur could be removed to the required minimum, it was not economically practical to do so, because the loss in treating would amount to about 20% of the gasoline; and that the treating would reduce the anti-knock value of the gasoline.

After various conferences and negotiations between representatives of the company and the refiner produced no settlement of the controversy, the company, on October 25, 1930, filed a mechanics lien for a balance claimed to be due it. On October 27, 1930, the refiner's general manager wrote the company, advising it that since the company had abandoned the project, the refiner would attempt to operate the plant. He wrote a similar letter on October 30, 1930 to which the company replied on November 1, 1930, saying that it had not abandoned the project, but had suspended work because it had been advised at the Pittsburgh conference that the refiner could not pay the contract price due the company, and that it would complete the contract if the refiner gave "adequate assurance the contract price will be paid when the work is completed". On November 3, 1930, Diescher wrote the company that it would not be allowed access to the land on which the project was located.

On November 14, 1930, the company filed an amended and supplemental mechanics lien, stating that the reasonable value of the labor and materials furnished

was $535,146.21; that the refiner had paid the company the sum of $442,000, and that there was a balance due the company in the sum of $93,146.21. On the following day, the company filed in the court below a bill of complaint to foreclose the mechanics lien, alleging performance on its part. The refiner answered, denying performance, alleging breach of the contract and supplemental contract, and praying that the bill be dismissed.

Thereafter the trustees under the bond issue of the refiner assigned any rights under the bond to the refiner under a provision requiring any recovery had to be paid to the trustees.

On January 31, 1931, the refiner filed in the court below an action alleging breach of the contract and supplemental contract, and praying for judgment against the company in the sum of $791,451.84, and against the surety for $482,545. The surety answered, asking that the action be stayed pending termination of the equitable suit and that the bond be reformed, among other things. The company answered, praying, among other things, that the action be stayed pending determination of the equitable suit.

The refiner then rebuilt the plant. The treating plant was abandoned; the coking unit was reconstructed into a re-run still used in connection with a new treating plant, and a new coking plant was built. The cost to the refiner was $313,709.72, of which about $180,000 was not paid, and the creditors to whom that amount was owing filed mechanics liens. The operations after remodeling the plant resulted in a loss. Bankruptcy proceedings were instituted against the refiner about August 1, 1931, and it was adjudicated a bankrupt on December 22, 1931.

On December 21, 1931, bankruptcy proceedings were pending against the refiner, and it filed a motion in the law action to consolidate it with the equity suit. A like motion was made in the equity suit on December 23, 1931. The company and the surety resisted the motions. On March 3, 1932, the court below held that the "action at law has now become a suit in equity by the interposition of an equitable defense, and is now subject to trial and disposition as in other suits of like character" and that in the two cases it was evident "that in the first instance only one question is presented for determination, and it is exactly the same in both cases, and that is whether [the company] performed its contract and is thereby entitled to a lien". It ordered that the action at law be transferred to the equity side of the calendar and that both cases be consolidated "for the purposes of trial and determination", and referred the consolidated causes to a special master.

On March 28, 1932, appellee as trustee in bankruptcy for the refiner was substituted as a party to the suit and action.

Thereafter a petition was filed in this court for a writ of mandamus to compel the court below to try the legal issues before a jury on the ground that the order of consolidation and reference deprived the company and the surety "of their constitutional right to a trial by jury". Smith Engineering Co. v. Pray, 9 Cir., 58 F.2d 926. This court denied the petition, saying (page 928): "* * * Certainly the situation is one that calls for the application of the rule that a court of equity, having once taken charge of the controversy, will proceed to fully determine that controversy."

A rehearing was granted, and this court then held that the company and the surety "waived their constitutional right to a trial of the legal issues by a jury" because they invoked "the power of the court of equity to suspend the trial of the legal action for the breach of the contract." Smith Engineering Co. v. Pray, 9 Cir., 61 F.2d 687, 692, certiorari denied 289 U.S. 733, 53 S. Ct. 594, 77 L.Ed. 1482.

On May 6, 1933, the refiner conveyed the refinery to Independent Refining Company, who thereafter operated the property.

In general, the questions of law presented in the trial below were: (1) Did the contract require construction of a refinery which would produce the specified yield of gasoline with a sulphur content not exceeding 0.10 per cent? (2) Did the contract require construction of a refinery having a capacity sufficient to treat 45,000 barrels of crude oil per month? (3) Did the contract provide that the company had only 30 to 60 days in which to remedy any defects shown by trial runs made in such period? The special master decided all the foregoing questions in the affirmative. The remaining question decided by him, so far as is material here, was one of fact, i. e., whether or not the company had performed the contract. He found that it had not, but had breached the same.

The special master concluded that appellee owed the company no balance, and that appellee was entitled to judgment for

$438,931.21. On October 1, 1935, the court below confirmed the special master's report, and dismissed the bill in the equity suit. On the same day, the court below entered judgment for appellee in the law action against the company and the surety for $438,931.21, and costs in the sum of $8,302.36. The company has appealed from the decree and the judgment, and the surety has also appealed from the judgment.

It is asserted here that the determination of the questions of law and the findings of fact were erroneous. It is here unnecessary to relate and discuss the opposing arguments and the conflicting evidence regarding these questions. We may assume for purposes of this decision that the determination of the questions of law and the question of fact in the court below was correct, but still we think the judgment and the decree rendered cannot stand.

The evidence as to whether or not 60% raw gasoline could be obtained from the crude oil in question was conflicting. There was, however, no conflict in the evidence as to such yield if the sulphur were eliminated to a maximum of 0.10 per cent. All evidence agreed that in that event, such yield was not obtainable. The special master found that such crude oil "did not and could not produce a yield of 60% gasoline conforming to and complying with U. S. Motor Specifications, either as to distillation range, or as to sulphur content. That the amount of raw and unfinished gasoline contained in said charging stock, recoverable from it when running to fuel oil, did not exceed 56% of said charging stock, and the treating and handling loss in the elimination of its sulphur content to the requirements of U. S. Motor Specifications would be from 20% to 25% of such raw and unfinished gasoline."

Thus, under the interpretation below, and assumed here, we find that the company agreed to obtain a yield of 60% gasoline from the crude oil in question which would contain not more than 0.10 per cent of sulphur, which is an impossibility. Appellants conceded in their brief filed prior to the hearing before us that under such interpretation, the contract and supplemental contract were impossible of performance, and argued that the contracts should not be construed to require elimination of sulphur, thus making performance of the contract and supplemental contract impossible. However, even if the contract were construed in accordance with appellants'

contention, under the findings of the special master it was impossible to obtain the guaranteed yield of gasoline, and therefore appellants' rule of construction did not aid them.

On the other hand, appellee contended in its brief filed prior to the hearing before us that the contract and supplemental contract were impossible of performance, but that since appellants knew or should have known of the impossibility, "the formation of a contract" was not prevented, and appellants' liability was not discharged. This contention seemed counter to a Montana statute regarding impossibility. On November 8, 1938, by order, we vacated submission of the causes, and ordered briefs filed by the parties respecting the interpretation and applicability of the statute in question. We therefore consider the matter in the light of the additional briefs.

In 2 Rev.Codes Mont. 1921, § 5672, it is provided that "The common law of England, so far as it is not repugnant to or inconsistent with the constitution of the United States, or the constitution or laws of this state, or of the codes, is the rule of decision in all the courts of this state". The "common law of England" as used in the statute "means that body of jurisprudence as applied and modified by the courts of this country up to the time it became a rule of decision in this commonwealth" and "that time began with our first territorial Legislature". Herrin v. Sutherland, 74 Mont. 587, 594, 241 P. 328, 330, 42 A.L.R. 937. See, also, Gas Products Co. v. Rankin, 63 Mont. 372, 389, 207 P. 993, 24 A.L.R. 294; Aetna Accident & Liability Co. v. Miller, 54 Mont. 377, 382, 170 P. 760, L.R.A.1918C, 954; State ex rel. Metcalf v. District Court, 52 Mont. 46, 50, 155 P. 278, L.R.A.1916F, 132, Ann.Cas.1918A, 985.

Under the above quoted statute, two questions are apparent: (1) What was the common law of England, as defined by Montana decisions, up to 1864, the date of the organization of Montana as a territory? (2) Is that law inconsistent or repugnant to the Montana codes?

With respect to the first question, there are two general kinds of impossibility of performance in contracts, as explained in 6 Williston on Cont. (Rev.Ed.), 5411, § 1932: "Impossibility may be due to the nature of the thing to be done, or merely to the incapacity of the particular person who has undertaken to do it. It is the difference between 'the thing cannot be done'

and 'I cannot do it'. The first is called objective; the second subjective. * * *"

It is clear here that the impossibility preventing performance was "due to the nature of the thing to be done" because the company undertook to obtain a yield of gasoline from the charging stock, which could not by any means be done.

█ It is also clear that the objective impossibility may be present at the time the contract is entered into, or may occur subsequently. E. g., see Paradine v. Jane, 1647, Aleyn, 26, 82 Eng.Rep. 897. Since the impossibility here existed at the time the contract was entered into, only cases disclosing such facts need be considered.

The cases involving the precise point at issue prior to 1864 are few, and the only ones which have come to our attention hold that where the impossibility of performance was unknown to the parties when the contract was made, such contract will not be enforced. Hitchcock v. Giddings, 1817, 4 Price, 135, 146 Eng.Rep. 418; Strickland v. Turner, 1852, 7 Exch. 208, 155 Eng.Rep. 199; Courturier v. Hastie, 1856, 5 H.L. Cas. 673, 6 Eng.Rul.Cas. 204. See, also, Stevens v. Coon, 1 Pin., Wis., 356, where a legal impossibility is held to have the same result. Appellee insists that the company bore the risk of impossibility, since it knew or should have known that performance was impossible when it made the promise. 2 Restate. of the Law, Contracts, 847, § 456; 6 Williston on Cont. (Rev.Ed.) 5416, § 1934. Although we find no cases prior to 1864 so holding, we will here assume that the common law rule is: a promise which is impossible of performance due to the nature of the thing to be done, is enforceable by the promisee, only if the promisor knew, or had reason to know, the facts disclosing the impossibility.

The second question arising from the above quoted statute, is whether the common law rule just stated, is repugnant to or inconsistent with the rule declared by code. The rule declared in 2 Rev.Codes of Mont.1921, § 7501, is: "Where a contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance * * * the entire contract is void."

In 1.Rev.Codes of Mont.1921, § 5 and 3 Rev.Codes of Mont.1921, § 10704, provide that "The provisions of this code, so far as they are substantially the same as existing statutes or the common law, must be construed as continuations thereof, and not as new enactments." We think the rule set forth in § 7501 departs from the common law rule, and therefore § 10704 is not here applicable. Section 7501 declares a contract, which in the nature of things is impossible of performance, to be void. It makes no exceptions for a case where the promisor knew, or had reason to know, of the impossibility. 1 Rev.Codes of Mont. 1921, § 4, provides: "The rule of the common law that statutes in derogation thereof are to be strictly construed has no application to the codes or other statutes of the state of Montana. The codes establish the law of this state respecting the subjects to which they relate and their provisions and all proceedings under them are to be liberally construed with a view to effect their objects and to promote justice." The statute just quoted prevents us from narrowing the application and effect of § 7501, by reading therein an exception of cases where the promisor knew or had reason to know of the impossibility.

That conclusion makes applicable 3 Rev.Codes of Mont.1921, § 10703, which provides in part: "In this state there is no common law in any case where the law is declared by the code or the statute * * *." Thus the only rule subject to application here is § 7501. Since, as has been seen, it is impossible to obtain the guaranteed yields from the charging stock, the statute invalidates the contract, if the same "has but a single object".

█ In the supplemental briefs filed by the parties in compliance with the court's order, appellants and appellee both concede that the contract and supplemental contract have but a single object. We think that conclusion is correct. 2 Rev.Codes of Mont. 1921, § 7498, provides that "The object of a contract is the thing which it is agreed, on the part of the party receiving the consideration, to do or not to do." The company, by the contract and supplemental contract, promised to construct "a complete operating oil refinery to process Oregon Basin crude, otherwise designated as charging stock, for the production of products as specified," and the exact yields are specified. Although various parts were contemplated, such as a combined topping and cracking unit, a coking unit, treating unit, fire unit, and storage facilities, we think there was only one object. For example, a contract to build a house has but one object, we think, although the house may contain several rooms, and plumbing and heat-

ing facilities. We think it is apparent that here the object was the construction of a complete oil refinery which would produce specified yields from Oregon Basin crude oil. It was impossible to obtain such yields from that charging stock, and therefore the contract and supplemental contract are, we think, void under § 7501.

Appellee contends that our decision should not be placed on a ground not urged in the court below. The Supreme Court of the United States, however, has set the precedent for us in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. In that case, petitioner and respondent both accepted as the law the rule stated in Swift v. Tyson, 41 U.S. 1, 16 Pet. 1, 10 L.Ed. 865. See pages 66, 68, 58 S.Ct. 817. It further appears from the dissenting opinion (page 88, 58 S.Ct. 817) that Erie R. Co. v. Tompkins, supra, was decided without giving the parties opportunity to present arguments pro and con on the point raised by the court. Here the parties were given opportunity to present arguments on the point raised, and they have done so. We see no reason why we should make what we think would be an erroneous decision, because the applicable law was not insisted upon by one of the parties.

Having reached that conclusion, it is unnecessary to discuss appellants' contention regarding the measure of damages, and the contention that they were entitled to a trial by jury. The judgment in the action at law must be reversed, with directions to enter judgment for appellants.

### The Decree In Equity

There remains to be disposed of, the company's contention that it is entitled to a decree granting it judgment on the quantum meruit, and foreclosing its mechanic's lien.

The special master found that the reasonable market value of the materials furnished and the labor performed by the company was $535,146.21; and that the refiner had paid $437,200. The company is therefore entitled to recover, if at all, the amount prayed for in the bill, in the sum of $93,146.21.

Appellee argues that the company is not entitled to recover, because if the contract and supplemental contract are void, the refiner is also relieved of its duty. While it is true, that neither party can be held under a void contract, the question

here is whether, independently of the contract, the refiner is liable on the quantum meruit. In Montana, it is held that a county is liable on quantum meruit for goods purchased by it, although the contract is illegal and void, where the contract "is merely malum prohibitum and did not contravene public policy". Hill County v. Shaw & Borden Co., 9 Cir., 225 F. 475, 476, 477; Hicks v. Stillwater County, 84 Mont. 38, 274 P. 296; Morse v. Board of Commissioners, 19 Mont. 450, 48 P. 745; State v. Dickerman, 16 Mont. 278, 40 P. 698. Since 7501 places illegal contracts, and contracts impossible of performance in the same category, and recovery on quantum meruit is allowed as to one, like recovery must be allowed on the other.

The judgment in the action at law is reversed, and the cause is remanded with directions to enter judgment for appellants; the decree in the suit in equity is reversed with directions to enter a decree, granting the company judgment for $93,-146.21, and foreclosing the mechanic's lien as prayed for in the bill.

### On Petition for Rehearing.

Appellee contends that by "their bond the appellants bound themselves to perform the contracts, and in case of non-performance to pay damages". Thus it is said that these were alternative promises, and although the promise of performance was impossible, the promise to pay damages was possible, and therefore the latter promise must be given effect.

In Cage's Executors v. Cassidy, 64 U.S. 109, 116, 23 How. 109, 116, 16 L.Ed. 430, it is said: "The natural limit of the obligation of a surety is to be found in the obligation of the principal; and when that is extinguished, the surety is, in general, liberated. In some codes, the obligation of a surety cannot extend beyond or exist under conditions more onerous than that of his principal. * * *" In Miller v. Stewart, 22 U.S. 680, 706, 9 Wheat. 680, 706, 6 L.Ed. 189, the doctrine was early announced that "if an obligation be dependent on another obligation (and, by parity of reasoning, upon the legal existence of another instrument), and the latter be discharged, or become void, the former is also discharged. * * *" Such is the law in Montana, where it is held that the effect of a bond is to extend the obligations of the contracts to the surety. 2 Rev.Codes of Mont. 1921, §§ 8202, 8184; Gary Hay &

500

Grain Co. v. Carlson, 79 Mont. 111, 255 P. 722; and see 2 Rev.Codes of Mont.1921, §§ 8201, 8185, 7553.

■ It is also urged that since the company promised to construct a complete oil refinery which would obtain specified yields from Oregon Basin crude oil, and also by the contract guaranteed that the refinery would produce the results specified, the guaranty was a warranty, and appellants are liable for breach of the warranty, independently of the contract. We think there is no merit in this contention, because the so-called warranty is found in a contract which the statute (§ 7501) declares void in its entirety, thus invalidating collateral promises in the contract.

■ The contention of amici curiae that a lien is invalid unless supported by a contract is disposed of by the statement that since recovery was permitted on quantum meruit, the lien is supported by the implied contract.

Petition for rehearing is denied.