N.R. SMITH, Circuit Judge,
dissenting:
The majority “conclude[s], contrary to the Forest Service’s contention, that it was ‘reasonably possible’ to provide some analysis of the environmental consequences on individual fish species in the 2004 EIS,” and thus that the agency’s decision not to provide this analysis “as soon as it [was] ‘reasonably possible’ to do so” was arbitrary and capricious. Maj. Op. 623,627. In doing so, the majority makes two fundamental errors: First, it reinvents the arbitrary and capricious standard of review, transforming it from an appropriately deferential standard to one freely allowing courts to substitute their judgments for that of the agency. In doing so, the majority disregards our circuit’s long-standing precedent holding that an agency’s timing of analysis required by the National Environmental Policy Act (NEPA) is not arbitrary and capricious if it is performed before a critical commitment of resources occurs. The majority instead creates an unclear rule based on “reasonable possibility” that imposes additional procedures not required by NEPA on the Forest Service. Such a rule “leave[s] the agencies uncertain as to their procedural duties under NEPA, ... invite[s] judicial involvement in the day-to-day decisionmaking process of the agencies, and ... invite[s] litigation.” Kleppe v. Sierra Club, 427 U.S. 390, 406, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).
Second, the majority ignores the tiering framework created by NEPA. Because the majority ignores such framework, it fails to differentiate between a site-specific environmental impact statement (“EIS”) and a programmatic EIS that focuses on high-level policy decisions. Under NEPA regulations on tiering and Ninth Circuit precedent, a programmatic EIS requires less detailed analysis than a site-specific EIS. Therefore, agencies are allowed to defer in-depth analysis until site-specific projects have been identified. Furthermore, agencies are given wide latitude in the tiering methodology they choose to implement, so long as the programmatic EIS allows for informed decision-making. As a result, courts owe a high level of deference to the methodological choices of the agency.
Because the majority’s opinion amounts to an inappropriate and substantial shift in our NEPA jurisprudence, I must dissent.
I. STANDARD OF REVIEW
Congress enacted NEPA to require agencies to produce an EIS whenever they engage in a major action that could significantly affect the environment. 42 U.S.C. § 4332(2)(C). However, Congress also enacted the Administrative Procedure Act (APA), which governs our review of an agency’s actions. Under the APA, we must employ a highly deferential standard *632 of review when reviewing the Forest Service’s actions in this case. 5 U.S.C. § 706(2)(A). Unless the Forest Service’s action is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,” we may not set it aside. Id.
In Lands Council II, a unanimous en banc decision, we explained that “[rjeview under the arbitrary and capricious standard ‘is narrow, and we do not substitute our judgment for that of the agency.’” Lands Council v. McNair (Lands Council II), 537 F.3d 981, 987 (9th Cir.2008) (en banc) (alteration in original omitted) (quoting Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1156 (9th Cir.2006), abrogated on other grounds by Winter v. Natural Res. Def. Council, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). We also noted that our circuit’s “environmental jurisprudence ha[d], at times, shifted away from the appropriate standard of review,” prior to 2008. Id. at 988.
Although Lands Council II only explicitly overruled Ecology Center, Inc. v. Austin, 430 F.3d 1057 (9th Cir.2005), explaining that Ecology Center was a case illustrative of this error, our correction extended beyond that solitary case. We referred to the shift in our jurisprudence occurring “in recent years,” which clearly alludes to multiple incorrect decisions. Lands Council II, 537 F.3d at 988. Our correction also dealt with the deference owed to agencies under our “appropriate standard of review” in general, id., rather than just regarding studies and on-the-ground analysis, as the majority argues, Maj. Op. 624. We observed that previous decisions committed “key errors” by imposing on agencies additional “requirements] not found in any relevant statute or regulation” and by showing insufficient deference to agencies and “their methodological choices.” Lands Council II, 537 F.3d at 991.
Therefore, we renounced this incorrect jurisprudence where we engaged in “fine-grained” assessments of agency action. Id. at 993. We instead observed that this was not the proper role for courts. Id. Rather, “our proper role is simply to ensure that the Forest Service made no ‘clear error of judgment’ that would render its action ‘arbitrary and capricious.’ ” Id. (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). The majority relies on cases decided prior to 2008 that suggest a less deferential role for courts. However, Lands Council II has irrevocably changed the legal landscape by setting forth the high level of deference owed by courts to agency action.
Accordingly, an agency’s decision can be set aside “only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.” Id. at 987 (internal quotation marks omitted) (emphasis added); see also Sierra Club v. U.S. Envtl. Prot. Agency, 346 F.3d 955, 961 (9th Cir.2003).
The majority argues that “the Forest Service ‘entirely failed to consider’ environmental consequences of the 2004 Framework on individual species of fish.” Maj. Op. 630. But “[wjhether an agency has overlooked ‘an important aspect of the problem,’ ... turns on what a relevant substantive statute makes ‘important.’ ” Or. Natural Res. Council v. Thomas, 92 F.3d 792, 798 (9th Cir.1996) (quoting Motor Vehicle Mfrs. Ass’n v. State Farm Mut., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). As discussed below in Part II, NEPA is the relevant statute. NEPA does not require site specific analy *633 sis be considered at the programmatic EIS stage. Rather, NEPA encourages the deferral of such analysis until the issues are ripe and analyzing them will be most meaningful. Thus, the Forest Service cannot have failed to consider an aspect of the problem required by NEPA by following NEPA’s tiered analysis structure and deferring specific analysis.
In addition, though the majority pays lip service to Lands Council II’s deferential standard of review, the majority relies on Kem v. U.S. Bureau of Land Management, 284 F.3d 1062 (9th Cir.2002) to engage in the same type of “fine-grained” analysis that was rebuked in Lands Council II.[1] Specifically, the majority demands that the agency provide whatever analysis the majority determines is “reasonably possible” “as soon as it can reasonably be done.” Id. at 1072. However, the majority is unable to provide any support for this rule for at least two reasons.
First, relying on Kem to require a programmatic EIS to include reasonably possible site-specific analysis as soon as reasonably possible stretches the language from Kem far beyond the facts of the case.[2] Kem did deal with a programmatic EIS. However, the agency actions at issue there were site-specific timber sales, constituting a critical commitment of resources. Id. at 1069 (“A ‘concrete plan,’ a ‘specific undertaking,’ and a ‘site-specific program’ incorporating the Guidelines, such as we anticipated in [a previous case], are now before us.”). The programmatic EIS in Kem had specifically deferred analysis of specific actions to future NEPA analysis. Id. at 1074. Rather than strike down this deferral as necessarily arbitrary and capricious, the Kem court merely looked to the subsequent EA to see whether the EA had sufficiently analyzed the site-specific action. Id. (“The second sentence [in the programmatic EIS] is not an analysis, but rather a promise of a later site-specific analysis to be performed in connection with specific projects ‘within the range of the Port-Orford-cedar.’ The revised EA for the Sandy-Remote Analysis Area is such a site-specific analysis. The adequacy of that EA has also been *634 challenged by ONRC. We now turn to that question.”).
Thus, Kern does not support the proposition that a programmatic EIS must include any site-specific analysis as soon as reasonably possible if no critical commitments of resources have occurred. Kern is rather inapposite to such a rule. Thus, applying the “reasonably possible” rule to a programmatic EIS that does not contemplate critical commitments of resources is not only unsupported by Kern’s holding, it also eviscerates the NEPA tiering framework discussed in Part II.
Second, such a rule, particularly when applied to a programmatic EIS, constitutes a dramatic departure from this circuit’s precedent regarding arbitrary and capricious review. Our long-standing rule has always been that “NEPA requires a full evaluation of site-specific impacts only when a ‘critical decision’ has been made to act on site development — ie., when ‘the agency proposes to make an irreversible and irretrievable commitment of the availability of resources to [a] project at a particular site.’ ” Friends of Yosemite Valley v. Norton, 348 F.3d 789, 801 (9th Cir. 2003) (quoting California v. Block, 690 F.2d 753, 761 (9th Cir.1982)). Until that “threshold” point, we are required to defer to the methodological choices of the agency regarding the timing of when site-specific analysis can reasonably be done. Block, 690 F.2d at 761.
The majority is correct that NEPA regulations encourage agencies to “integrate the NEPA process with other planning at the earliest possible time.” Maj. Op. 624 (quoting 40 C.F.R. § 1501.2). But “this court has interpreted these regulations as requiring agencies to prepare NEPA documents, such as ... an EIS, ‘before any irreversible and irretrievable commitment of resources.’ ” Metcalf v. Daley, 214 F.3d 1135, 1143 (9th Cir.2000). This rule is derived from the text of NEPA itself. See Conner v. Burford, 848 F.2d 1441, 1446 n. 13 (9th Cir.1988) (“The ‘irreversible and irretrievable commitment of resources’ criterion is derived from [NEPA], which requires an EIS to include a statement of ‘any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.’ ”). This rule has also proved useful, as explained by environmental law scholars, because “without inside knowledge, [courts] really cannot know the status of various initiatives under consideration....” James Salzman and Barton H. Thompson, Jr., Environmental Law and Policy 328 (3d ed. 2010). Thus, “to provide a bright line standard” for “challenging the timing of EIS preparation ... courts have required that preparation of an EIS commence ‘before [an] irreversible and irretrievable commitment of resources.’ ” Id. at 328-29 (quoting Environmental Defense Fund, Inc. v. Andrus, 596 F.2d 848, 852 (9th Cir.1979)).
Consequently, in multiple cases, we have explained that an agency’s timing of its analysis becomes arbitrary and capricious only if the NEPA documents are prepared after an irreversible and irretrievable commitment of resources has occurred. See, e.g., Native Ecosystems Council v. Dombeck, 304 F.3d 886, 893 (9th Cir.2002) (“[T]he issue we must decide here is whether the Federal Defendants prepared the EA too late in the decision-making process, i.e., after making an irreversible and irretrievable commitment of resources.” (quoting Metcalf, 214 F.3d at 1143)). On the other hand, we have held that an agency is “free to decide not to [provide NEPA analysis] up until the time it issued its Decision Notice for the” specific commitment of resources. Id. at 893 (emphasis in original). In other words, an agency cannot have entirely failed to con *635 sider an aspect of a problem before a critical commitment of resources has taken place, because the agency still has an opportunity up to that point to provide the necessary analysis. Accordingly, whether analysis is “reasonably possible” and was provided “as soon as it is reasonably possible” is wholly irrelevant to the inquiry of whether the timing of the agency’s analysis was arbitrary and capricious.
The majority cites, but ignores, precedent upholding this critical commitment of resources threshold. See, e.g., Maj. Op. 622 (citing Friends of Yosemite Valley, 348 F.3d at 800). The majority instead requires its own preferred timing for NEPA analysis. Essentially, the majority misunderstands that there is a wide range of permissible agency action between what courts hope for as ideal agency actions, and actions that fall below a much lower threshold, becoming arbitrary and capricious. See F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 129 S.Ct. 1800, 1810, 173 L.Ed.2d 738 (2009) (under arbitrary and capricious review, courts “should ‘uphold a decision of less than ideal clarity if the agency’s path may reasonably be discerned.’ ” (quoting Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974))); Texas Clinical Labs, Inc. v. Sebelius, 612 F.3d 771, 775 (5th Cir.2010) (“An agency’s decision need not be ideal or even, perhaps, correct so long as not arbitrary or capricious and so long as the agency gave at least minimal consideration to the relevant facts as contained in the record.” (internal quotation marks omitted)). The majority’s proposed rule would turn arbitrary and capricious review on its head and allow courts to keep agencies on a tight leash, directing agencies based on what courts view as best, as illustrated by the majority’s decision in this case. While there are certainly times when I would disagree with quality or timing of an agency’s analysis and would enjoy dictating my own agenda, arbitrary and capricious review simply provides courts with no warrant to do so.
In the present case, it is undisputed that the Forest service has not made a critical commitment of resources regarding any site-specific projects. The 2004 Framework “do[es] not provide final authorization for any activity,”[3] and “subsequent and full environmental review [of these site-specific projects] is contemplated,” Friends of Yosemite Valley, 348 F.3d at 801.[4] It only establishes the standards and guidelines under which future projects permitting such actions must occur. Thus, the Forest Service’s timing of analysis has not reached the brightline threshold upheld by our precedent, and the Forest Service’s decision to defer more specific analysis regarding fish cannot be arbitrary and capricious.
II. THE FOREST SERVICE APPROPRIATELY UTILIZED A TIERED ANALYSIS STRUCTURE
Because it is irrelevant whether the Forest Service provided a reasonably possible amount of analysis as soon as reasonably possible, the appropriate issues to review are actually 1) whether the agency’s use of *636 a tiered analysis structure was arbitrary and capricious, and 2) whether the amount of high-level analysis in the current programmatic EIS was sufficient to engage in informed decision-making regarding broad policies affecting all species, including fish.
A. The agency’s use of a tiered analysis structure to defer in-depth analysis until concrete, site-specific projects were planned was not arbitrary and capricious.
The agency’s methodological decision to utilize a tiered EIS approach and defer in-depth analysis of site-specific projects was not only reasonable, but it is also encouraged by the Council on Environmental Quality’s[5] (CEQ) regulations for implementing NEPA. These regulations explain that “[a]gencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review.” 40 C.F.R. § 1502.20 (citations omitted) (emphasis added). The term “tiering” refers to “the coverage of general matters in broader environmental impact statements (such as national program or policy statements)” subsequently followed by “narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.” 40 C.F.R. § 1508.28. These regulations explain that tiering is appropriate when the sequence of analysis moves from “a program, plan, or policy environmental impact statement ... to a site-specific statement or analysis.” § 1508.28(a).
Agencies have a wide range of discretion in determining how to implement their tiering strategy. In a 2001 memorandum, Frederick Skaer, Director of the Office of NEPA Facilitation, explained that “we have deliberately stayed away from prescriptive guidelines on how to apply tiering so that each tiered process can be custom designed to the specific situation. You therefore have considerable latitude in the specific tiering approach you utilize to implement the NEPA policy mandate of informed decision-making.” Office of NEPA Facilitation, Memorandum on Tiering of the 1-70 Project, Kansas City, Missouri to St. Louis, June 18, 2001 (citation omitted); see also Ecology Ctr., Inc. v. Austin, 430 F.3d 1057, 1072 (9th Cir.2005) (McKeown, J., dissenting) (“The limited nature of this inquiry underscores the latitude in implementation and interpretation that Congress intended for its agents.”), overruled on other grounds by Lands Council II, 537 F.3d at 991.
Because the 2004 Framework is a programmatic EIS, that focuses on broad policies and general goals and does not make critical commitments of resources (as discussed in Part I), the Forest Service’s decision to utilize a tiered approach and defer more in-depth analysis was clearly a reasonable choice within the agency’s discretion. Thus, so long as the programmatic EIS provides sufficient guidelines to foster informed decision-making (as discussed in Part II.B), nothing more can be required of the agency at this stage.
The majority acknowledges this NEPA tiering framework. Maj. Op. 623. Then the majority promptly disregards our precedent and argues that “[r]egardless of *637 whether a programmatic or site-specific plan is at issue, NEPA requires that an EIS analyze environmental consequences of a proposed plan as soon as it is ‘reasonably possible’ to do so.” Id. at 617, 623-24, 626, 627, 631. The majority also argues that the agency was required to perform an “appropriate level of environmental analysis” based on what the majority determines was “reasonably possible.” Id. at 617, 624, 626-27. The majority observes that the 2001 Framework provided more analysis of specific aquatic species. Id. at 621-22. The majority also claims that the agency failed to explain why it provided less analysis of fish in the.2004 Framework. Id. at 626. As a result, the majority asserts that this proves the agency was able to provide more in-depth analysis than it did. Id. at 627. Consequently, the majority holds that the agency’s lesser amount of analysis of fish in the 2004 Framework was arbitrary and capricious. Id. at 630. The majority’s arguments suffer from at least four flaws.
First, this is a classic example of courts imposing additional procedures on agencies that have no basis in statutory or regulatory law. Nowhere in the text of NEPA, or its regulations, is an agency required to provide a similar amount of analysis in the current EIS as was performed in a previous EIS. Both the 2001 and the 2004 Frameworks were programmatic environmental impact statements. The Forest Service voluntarily chose to provide more in-depth analysis in the 2001 Framework than was necessary, but nothing in NEPA requires an agency to provide an equivalent level of analysis for a subsequent EIS. As long as the agency’s analysis falls within the wide zone of reasonability, the agency need not provide the most ideal analysis in order to avoid having its decision struck down as arbitrary and capricious. See Dombeck, 304 F.3d at 892 (“We will uphold the Forest Service’s decision not to [provide NEPA analysis until a later date] unless that decision was unreasonable.”). While it may irritate the majority that the Forest Service did not provide as much detailed analysis in the 2004 EIS as in the 2001 EIS, there is no precedent for the majority’s decision to strike down the Forest Service’s decision to defer more in-depth analysis until more concrete projects have been identified.
NEPA also does not impose a blanket requirement on agencies to provide as much analysis as the majority determines is reasonably possible “as soon as it can reasonably be done.” Maj. Op. 623 (quoting Kern, 284 F.3d at 1072). To the contrary, the NEPA regulations about tiering clearly indicate that delayed analysis is not only allowed, but even preferable in some instances. 40 C.F.R. § 1502.20; see also Block, 690 F.2d at 761 (noting that the analysis is more meaningful when a “concrete development proposal crystallizes the dimensions of a project’s probable environmental consequences”); Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166 (9th Cir.2003) (NEPA’s purpose is “to ensure informed decision-making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct.”).
The majority is correct that NEPA is designed to encourage agencies to “integrate the NEPA process with other planning at the earliest possible time.” Maj. Op. 624 (quoting 40 C.F.R. § 1501.2). But, in Friends of Yosemite Valley and other cases, we have recognized that NEPA’s encouragement of early analysis is “tempered by (1) ‘the statutory command that [a reviewing court] focus upon a proposal’s parameters as the agency defines them,’ and (2) ‘the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a pro *638 ject’s probable environmental consequences.’ ” 348 F.3d at 800 (quoting Block, 690 F.2d at 761). The majority ignores this tempering effect. Instead, it essentially demands as much analysis for fish as the majority determines is reasonably possible as soon as the agency can provide it, irrespective of the Forest Service’s methodological choices and decision to utilize a tiered analysis structure.
Second, the majority’s argument comparing the volume of analysis between the 2001 and 2004 Frameworks suffers from the proverbial comparison of apples to oranges. The 2001 Framework contained many more broad-based rules and clear-cut policies that made for easier identification of issues. The 2004 Framework by design calls for a flexible approach based on specific conditions,[6] and it leaves critical decisions to be made when site specific projects are identified. For example, under the previous 2001 EIS, the “spacial location of strategically-placed area treatments” was specifically limited in geographic location to the “upper two-thirds of slopes,” whereas the 2004 EIS contains no such geographic limitations. 1 SEIS at 210. Similarly, the 2001 EIS limited compaction in riparian conservation areas to “less than 5% of project activity areas,” whereas the 2004 Framework provides “[n]o firm numeric standard[s] ..., thus allowing for site-specific evaluations.” Id. As a result, it is not surprising that the 2001 Framework more easily lent itself to more extensive analysis up front.
Third, the majority’s insistence on requiring the agency to provide the amount of analysis the majority thinks is appropriate as soon as reasonably possible illustrates a misunderstanding of the tiering framework set forth in the CEQ regulations. These regulations balance the public’s need to receive analysis quickly with the public’s competing need to receive analysis regarding “actual issues ripe for decision.” 40 C.F.R. § 1502.20. To achieve this balance, agencies are given “wide latitude” in choosing the scope of analysis that will occur at different stages of the tiered analysis structure. Office of NEPA Facilitation, Memorandum on Tiering of the I-70 Project, Kansas City, Missouri to St. Louis, June 18, 2001.
The majority correctly observes that the level of analysis may differ depending on the scope of the agency action. Maj. Op. 617, 624, 626-27. But then the majority incorrectly takes it upon itself to determine the scope of the project, based on the quantity and timing of analysis that the majority determines is “reasonably possible.” Id. at 617, 624. This approach not only ignores the wide latitude the NEPA regulations accord agencies in determining how to structure their tiered analysis methodology, it directly contradicts Supreme Court and Ninth Circuit precedent. See Kleppe, 427 U.S. at 413, 96 S.Ct. 2718 (agencies have discretion to “intelligently determine the scope of environmental analysis and review specific actions [they] may take”); Friends of Yosemite Valley, 348 F.3d at 800 (“[A] reviewing court [must] focus upon a proposal’s parameters as the agency defines them” (alteration in original omitted) (quoting Block, 690 F.2d at 761)).
*639 As the majority observes, it is true that the CEQ’s Task Force has expressed concern that the use of a tiering structure can result in a “shell game” regarding “when and where deferred issues will be addressed.” Maj. Op. 626 (citing The Nepa Task Force, Modernizing Nepa Implementation 39 (2003), available at http://ceq. hss.doe.gov/ntfireport/finalreport.pdf). But the majority ignores that, in the same paragraph discussing this potential “shell game,” the Task Force recommends that the CEQ address the problem by creating requirements whereby programmatic documents would “provide a roadmap, explaining where and when deferred issues raised by the public and/or regulatory agencies will be addressed.” This potential regulatory solution of requiring a simple roadmap for programmatic analysis is markedly different than the majority’s approach of imposing a novel and unclear judicial requirement, destroying an agency’s methodological flexibility and requiring whatever analysis the majority thinks is “reasonably possible” to be performed “as soon as it can reasonably be done.”
The majority seems to suggest that the Forest Service inappropriately participated in such a “shell game” in this case by providing a “puzzling” and unfulfilled promise to perform specific analysis of individual fish species. Maj. Op. 624-25. But, even assuming that the Forest Service was required to follow through on any promises made in the EIS, the Forest Service did not break any promises. As the majority acknowledges, the Forest Service never explicitly promised to analyze individual fish species; it merely explained that the “[ejffects of the alternatives on species dependent on aquatic, riparian, and meadow habitats” would be “explained elsewhere in th[e] SEIS.” 1 SEIS at 207; see also Maj. Op. 627. The Forest Service clearly delivered on this promise. Specifically, as to aquatic habitats, Part II.B highlights the Forest Service’s extensive analysis regarding how various alternatives would affect aquatic habitats and the corresponding dependent species in general. Moreover, as the majority also notes, the 2004 Framework incorporates by reference two different biological assessments analyzing the consequences of the 2004 EIS on individual fish species. Maj. Op. 627-28. While the analysis from the biological assessments is likely insufficient for site-specific NEPA analysis regarding a potential critical commitment of resources affecting fish, it further illustrates that the Forest Service did not break its promise to provide at least some analysis of aquatic species in the programmatic EIS.
Fourth, the majority incorrectly asserts that there is “no explanation” for the Forest Service’s decision to defer more in-depth analysis of individual fish species. See, e.g., Maj. Op. 626. However, the Forest Service clearly did explain its reasons for deferring in depth analysis until more site-specific projects were identified. Specifically, in its Record of Decision, the Forest Service stated,
Our ability to strategically place fuel treatments for optimum effectiveness has been compromised by the set of complicated rules in the [2001 Framework]. The standards and guidelines in that [Framework] are applied at the stand level, rather than by land allocations .... Some of the rules are so detailed that they prescribe down to one acre what is allowed, and require measuring change in canopy to ten percent increments, which is not consistently practical with existing measurement tools. This fine-scale approach limits our ability to make significant progress .... [0]ur ability to strategically place fuels treatments on the landscape *640 has been compromised by the complexity of rules [which allows] ... more habitat [to be] lost to wildfire.... This decision is intended to reverse that trend.
Record of Decision at 8-9; see also Appellee’s Br. at 6. As a result, the agency explained that the 2004 EIS was being implemented to “assure the most efficient and appropriate use of government resources .... ” Record of Decision at 23-24. The Forest Service primarily argued not that providing more analysis would be entirely impossible, but rather that “there was insufficient information and analytic tools for a meaningful analysis.... ” Appellee’s Br. at 48 (emphasis added). Therefore, the majority should have concluded that it was well within the Forest Service’s discretion to determine that the benefits of deferring in-depth analysis of aquatic species to provide more meaningful analysis outweighed any delays in information.
If the Forest Service commits to a site-specific project in the future, without engaging in the required level of NEPA analysis, then Pacific Rivers might have a viable NEPA claim. Indeed, it is likely that “[t]he deficiencies noted by the” majority opinion (regarding analysis of fish) “are precisely the omissions the Forest Service will need to correct in order to comply fully with NEPA” at a later time. Block, 690 F.2d at 763; see also N. Alaska Envtl. Ctr. v. Lujan, 961 F.2d 886, 891 (9th Cir. 1992) (approving a programmatic EIS that deferred detailed analysis until an application for a mining permit was submitted, but noting that “judicial estoppel precludes the Park Service from later arguing that it has no further duty to consider mitigation measures ...”).
Not only has the Forest Service affirmed many times that they plan to engage in further detailed analysis when specific projects are identified,[7] but we have a legal duty to assume that the agency will perform that analysis. In Salmon River Concerned Citizens v. Robertson, we observed that courts should “assume that government agencies will ... comply with their NEPA obligations in later stages of development.” 32 F.3d 1346, 1358 (9th Cir.1994) (quoting Conner, 848 F.2d at 1448).
B. The amount of programmatic, high-level analysis was sufficient to engage in informed decision-making regarding broad policies affecting all species, including fish.
The majority claims that the Forest Service “entirely failed to consider an impor *641 tant aspect of the problem” by not providing in-depth analysis regarding how the 2004 programmatic Framework would affect specific species of fish. Maj. Op. 680 (citing Lands Council II, 537 F.3d at 987). But here, because the Forest Service chose to utilize a tiered NEPA analysis structure and implement a programmatic EIS, the relevant scope of “the problem” is whether the Forest Service “providefd] ‘sufficient detail to foster informed decisionmaking.’ ” Friends of Yosemite Valley, 348 F.3d at 800 (quoting Lujan, 961 F.2d at 890-91). As discussed above, the majority is only able to claim otherwise by ignoring the proper standard of review and refusing to defer to the Forest Service’s discretion in determining the scope of its analysis. See Kleppe, 427 U.S. at 413, 96 S.Ct. 2718 (agencies have discretion to “intelligently determine the scope of environmental analysis and review specific actions [they] may take”); Friends of Yosemite Valley, 348 F.3d at 800 (“[A] reviewing court [must] focus upon a proposal’s parameters as the agency defines them”) (alteration in original omitted) (quoting Block, 690 F.2d at 761). The scope of analysis in a programmatic EIS can include considerably less detail than in an EIS analyzing a site-specific project. See, e.g., Res. Ltd., Inc. v. Robertson, 35 F.3d 1300, 1306 (9th Cir.1993); Salmon River, 32 F.3d at 1357-58; Block, 690 F.2d at 761.
Thus, under the Forest Service’s tiered-analysis approach, the 2004 EIS provides sufficient high-level standards to guide future on-the-ground decisions affecting fish. These standards generally contemplate the relevant range of potential agency action and the consequences on various habitats in the Sierra Nevada. The 2004 Framework “begins by explaining that cumulative effects were analyzed in detail for the eight alternatives considered in the 2001 Framework.” Appellee’s Br. at 50. “It then identifies activities that have occurred” since the 2001 Framework, “including soil and water resource improvements, hazardous fuels reductions, wildfire suppression,” and road construction. Id.
Specifically regarding aquatic habitats (home to fish species), the Framework notes that these are one of the most “degraded of all habitats in the Sierra Nevada,” though much of the original problem was related to “lower elevation dams and diversions.” 1 SEIS at 3. The EIS observed that “[t]he greatest effects on the [a]quatic, [r]iparian and [m]eadow [e]co-systems will generally be from either mechanical fuel treatments or catastrophic wildfires.” Id. at 12, 96. “Fires can have extraordinary effects on watershed processes and, as a consequence, significantly influence aquatic organisms and the quality of aquatic habitats in many ways.” Id. at 208 (citation omitted). These effects include “reductions in riparian shading and altered streamfiows [that] can increase stream temperatures to extreme levels,” “[flooding, surface erosion, and mass wasting ... due to vegetation loss,” and “increases in sedimentation, debris flows, and wood inputs may occur” as well as “[c]omplete channel reorganization.” Id.
The Forest Service weighed “tradeoffs between potential aquatic ecosystem and water quality impacts from fuel management activities (mechanical treatment and prescribed fire) and risks associated with high severity wildfires.” Id. (citation omitted). It recognized that “with respect to aquatic ecosystems, there are arguments for and against the use of fuels treatments to reduce the extent and severity of future fires.” Id. (citation omitted). After providing this analysis, the EIS determined “alternatives that lower the risk of fire and have medium levels of treatment pose the least risk to aquatic and riparian system.” Id. at 12. Therefore, by allowing in *642 creased fuels treatments, the 2004 Framework would reduce the anticipated acres burned by just over 15% from the 2001 Framework. Id. at 98.
The Forest Service recognized that this approach “pose[d] higher short-term risks to aquatic resources because it prescribes larger amounts of mechanical treatments and greater treatment intensities.” Id. at 12, 97, 215. But the Forest Service concluded that this was mitigated by the expected long-term benefits to aquatic habitats resulting from reducing wildfires. Id. The Forest Service also asserted its intent to reduce any short-term threats through objectives listed in its “Aquatic Management Strategy,” best management practices, and goals related to “landscape-level conditions” and “land allocations” that would be applied during “project level analysis.” Id. at 12, 97, 207, 210, 215. It was reasonable for the Forest Service to defer more specific analysis of the proposal’s effect on aquatic species, because “[pjotential treatment effects on aquatic, riparian and meadow ecosystems are largely a function of the amounts, types, intensities, and locations of treatments and the standards by which they are implemented.” Id. at 210.
Although the majority correctly notes that the 2004 Framework anticipates considerably more logging in the forests, the majority ignores the fact that much of that logging may never occur. For example, 214 million board feet were offered for sale on average between FY 2000-2002, but only 118 million were actually sold— approximately 55%. Id. at 174-75. Similarly, only 58% of the fuel treatments projected under the 2001 Framework were carried out in the first three years of the Framework. Id.; Appellee’s Br. at 22-23. Therefore, the Forest Service reasonably concluded that it would be inefficient to perform a detailed analysis of the impact of activities that may never take place, and the 2004 EIS contains sufficient analysis of the probable consequences of increased fuel management at the programmatic level.
The 2004 Framework identified roads as another “critical component” of the risk and benefit “tradeoffs” to aquatic species, which include fish. 1 SEIS at 209. The EIS explained that roads are just behind wildfires in their potential effect on “aquatic ecosystems and water quality in forested environments.” Id. The EIS cited studies discussing how “roads can deliver more sediment to streams than any other human disturbance in forested environments.” Id. (citation omitted). However, the studies also indicated that “surface erosion from roads can be reduced through improved design, construction, and maintenance practices,” and “[pjroper road location, drainage, surfacing, and cut slope and fill slope treatments are important in limiting effects.” Id. (citation omitted). The Forest Service explained that the proposed “modest reduction in overall road miles, and improved road conditions,” subsequently adopted in the 2004 Framework, were some of “the most important aspects of reducing risks to aquatic resources.” Id. at 215.
The Forest Service determined that, because many details of actual on-the-ground activities were yet unknown, a more detailed analysis would be appropriately conducted when specific projects were identified. For example, the EIS explained that “actual locations and miles of roadwork [will] be determined through project-level planning and analysis.” 2 SEIS at 66. Changing the location of a proposed road by just a few hundred feet could make a substantial difference in the impact it had on riparian areas and on fish. A different location might have significantly different vegetation, soil type, and topography. Changing the location could even place a road in a completely different drainage *643 basin, potentially impacting entirely different species of fish. See, e.g., Biological Assessment for SNFPA SEIS 146, July 30, 2003 (Paiute cutthroat trout found only in 14.5 miles of streams).
The EIS explained that “road management does not vary substantially between [the 2001 Framework and the 2004 Framework]. Under both alternatives, the ... biological effects of roads, as previously described, would be reduced across the bioregion....” 1 SEIS at 212. The EIS further noted that, under the 2004 Framework, there would be a decrease in the net miles of roads. Id. (under the 2004 Framework, “1175 miles would be decommissioned and 115 miles of new road would be constructed”). Although the miles of reconstructed roads would almost double and may have short-term impacts, reconstructed roads would be expected to “improve water quality and aquatic habitat. ...” Id.
The 2004 EIS also provided analysis of the effects to watersheds from on-the-ground activity that the Forest Service might permit under the Framework. The Framework explained that, as a broad-based policy, future projects should remain protective of wildlife but strive for more effective reduction of hazardous fuels. See, e.g., Appellee’s Br. at 6, 9, 36, 54. It also identified activities that have occurred since the 2001 Framework, including soil and water resource improvements, hazardous fuels reductions, wildfire suppression, and road construction. Id. at 50. Based on this information, it analyzed combined or synergistic effects of the elements of the 2004 Framework on aquatic ecosystems and species, explaining that the 2001 and 2004 Frameworks are expected to have similar effects, because both alternatives are required to meet soil quality standards. Id. at 47-48.
Similarly, the EIS addressed the impacts of grazing with sufficient detail to satisfy NEPA on a programmatic level. As with logging and road construction, the Framework calls for a flexible approach based on specific conditions, rather than a full-scale analysis at this stage. The same 2001 standards will continue to be in effect and “are expected to reduce erosion of meadows and improve aquatic habitat conditions by facilitating the growth of stabilizing vegetation along streams.” 1 SEIS at 214. The 2001 and the 2004 Frameworks primarily differ in that changes to utilization and stubble heights may be allowed in the 2004 Framework when current range conditions are “good to excellent” (and after “rigorous[ ] evaluation]”). Id. Monitoring requirements under this flexible approach will “minimize[] differences in effects on aquatic ... ecosystems between the [2001 and 2004 Frameworks].” Id.
Thus, after recognizing the general impact that various proposals could have on the environment and the measures that could mitigate those effects in the programmatic EIS, the Forest Service reasonably deferred the detailed analysis of future site-specific projects. Based on this analysis, the Forest Service clearly did not “entirely fail[ ]” to consider an important aspect of the programmatic analysis required to provide informed decision-making. The majority may have preferred more specific analysis about individual fish species, but such preference is not a justifiable reason under NEPA to disregard the agency’s analysis as arbitrary and capricious.
III. CONCLUSION
The agency clearly did not “reify] on factors Congress did not intend it to consider” when it utilized the tiered methodology encouraged by the CEQ regulations for implementing NEPA. Lands Council II, 537 F.3d at 987. The Forest Service also did not “entirely fail[ ] to consider an *644 important aspect” of the high level policies set forth in their programmatic EIS. Id. Lastly, the agency clearly did not offer an explanation for their programmatic EIS that is “so implausible” that it cannot “be ascribed to a difference in view or the product of agency expertise.” Id. Because we can only overturn an agency’s action if the agency committed one of these arbitrary and capricious errors, and because no such error occurred in this case, I would appropriately defer to the Forest Service’s reasonable decision and affirm.

. The majority attempts to argue that the Forest Service recognizes that Kem is the correct rule. Maj. Op. 624 (citing Appellee’s Br. at 25). However, the Forest Service merely admitted that Pacific Rivers was "correct[ ]’’ in how it articulated the holding of Kem. In the same paragraph, the Forest Service argues that the determination of what analysis should be given in a programmatic EIS is "a methodological question within the expertise of the agency.” Appellee’s Br. at 25. Furthermore, even if the Forest Service did make a concession about a question of law, there is "no reason why we should make what we think would be an erroneous decision, because the applicable law was not insisted upon by one of the parties.” United States v. Miller, 822 F.2d 828, 832 (9th Cir.1987) (quoting Smith Engineering Co. v. Rice, 102 F.2d 492, 499 (9th Cir.1938)). "The rule has been repeated in a variety of circumstances. Even if a concession is made by the government, we are not bound by the government’s 'erroneous view of the law.’ ” Id. (quoting Flamingo Resort, Inc. v. United States, 664 F.2d 1387, 1391 n. 5 (9th Cir.1982)).

. It is also worth noting that the "as soon as it can reasonably be done” language appears to have been created whole cloth by the court in Kem. Id. at 1072. This is also true of Kern's language, with no citation, asserting that "[i]f it is reasonably possible to analyze the environmental consequences in an EIS ..., the agency is required to perform that analysis.” Id. Until now, this language has yet to be quoted by a subsequent Ninth Circuit appellate case. Indeed, the only case the majority is able to “dig up” that applies Kern’s rule is from the Tenth Circuit. See Maj. Op. 624 (citing New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 707-08, 716 (10th Cir.2009)). Even in the context of the facts of Kem, then, this "reasonably possible” rule appears to be a departure from our established precedent.

. United States Dept, of Agriculture, Forest Service, Record of Decision, Sierra Nevada Forest Plan Amendment, Final Supplemental Environmental Impact Statement 24 (January 2004) [hereinafter Record of Decision].

. See also WildWest Inst. v. Bull, 547 F.3d 1162, 1168 (9th Cir.2008) (holding that NEPA analysis need only be performed before there is "any irreversible and irretrievable commitment of resources,” and thus the Forest Service’s decision to pre-mark trees did not irretrievably commit the Forest Service to a specific course of action and was not arbitrary and capricious).

. The CEQ was established under Title II of NEPA and is charged with the task of "formulat[ing] and recommending] national policies to promote the improvement of the quality of the environment.” 42 U.S.C. § 4342.

. "In general, the changes proposed in [the 2004 Framework] are designed to meet the intent of the standards and guidelines in [the previous Framework], but allow flexibility to design management practices [to] address local conditions.” United States Dept, of Agrículture, Forest Service, Siena Nevada Forest Plan Amendment, 1 Final Supplemental Environmental Impact Statement 214 (January 2004) [hereinafter 1 SEIS] (emphasis added) (citation omitted).

. See, e.g., Record of Decision at 20 ("This [Record of Decision] does not authorize timber sales or any other specific activity on the Sierra Nevada national forests. Site-specific decisions will be made on projects in compliance with NEPA, ESA, and other environmental laws following applicable public involvement and administrative appeal procedures.”); United States Dept, of Agriculture, Forest Service, Sierra Nevada Forest Plan Amendment, 2 Final Supplemental Environmental Impact Statement, Response to Public Comments 66, 67 (January 2004) [hereinafter 2 SEIS] ("Actual locations and miles of roadwork would be determined through project-level planning and analysis.”); Id. at 124, 125 ("Any site-specific actions taken to implement direction in the Forest Plan Amendment would require compliance with NEPA. An environmental analysis would be completed to assess the potential impacts of proposed activities on water quality and aquatic and riparian systems. The analysis would also include an assessment of cumulative watershed effects relative to thresholds of concern established for watersheds in the project analysis area.”); Appellee’s Br. at 49 ("At the project-level, the Forest Service will consider both the synergistic effects of actions proposed within a project, where applicable, as well as the cumulative effects of multiple projects conforming to the Framework, again where applicable.”).