N.R. SMITH, Circuit Judge,
dissenting:
“Of all the attributes of sovereignty, none is more indisputable than that of [a State’s] action upon its own territory.” Green v. Biddle, 21 U.S. 1, 43, 8 Wheat. 1, 5 L.Ed. 547 (1823). Yet today, the majority holds that it was permissible for an agency to exercise what Chief Justice Roberts has called “an extraordinary assertion of power”[1] by taking land into trust for an Indian reservation in the middle of one of Arizona’s most populated cities, contrary to the plain language of the Gila Bend Indian Reservation Lands Replacement Act, Pub.L. No. 99-503, 100 Stat. 1798 (1986) (“Gila Bend Act”). The statutory text of the Gila Bend Act clearly prohibits the Secretary’s ability to take land, that is “within the corporate limits” of a city, into trust when the city’s limits wholly surround that land, such as the parcel at issue in this case.
Furthermore, even if the Gila Bend Act is “ambiguous,” as the majority argues, the Supreme Court has made clear that courts should “not extend Chevron deference” to an agency decision where the “administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power” such as the regulation of a State’s land not authorized by “a clear statement from Congress.” Solid Waste Agency of N. Cook Cnty. (SWANCC) v. U.S. Army Corps of Engineers, 531 U.S. 159, 172-74, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001); see also Gregory v. Ashcroft, 501 U.S. 452, 460-64, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Rather, courts should assume that, “the background principles of our federal system ... belie the notion that Congress would use ... an obscure grant of authority to regulate areas traditionally supervised by the States’ police power.” Gonzales v. Oregon, 546 U.S. 243, 274, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006). These concerns are particularly relevant here, where the Department of Interior made its decision in an ex-parte proceeding that did not involve the participation of the State of Arizona and without formal proceedings or a hearing for any other protesting parties.
Because the majority’s decision upholds an agency interpretation (1) that is contrary to the plain language of a statute and (2) that effectively renders political protections afforded to States in our federalism system virtually nonexistent, I must respectfully dissent.
I.
I generally agree with the facts and procedural history as set forth by the majority. Nevertheless, additional facts are relevant to my analysis in Part II. Thus, as the late Paul Harvey would say, “here’s the rest of the story.”
A.
The Tohono O’Odham Nation (“the Nation”) is a federally recognized Indian tribe with the second largest Tribal land base in the United States at 2.8 million acres. That land base amounts to 4,375 square miles of reservation in South and Central Arizona. To put this size in perspective, the State of Connecticut is only slightly larger, at 5,006 square miles in area. The State of Delaware is less than half the size, at 2,026 square miles.
The Gila Bend Reservation had previously been part of the Nation’s land base. The reservation was nearly 10,000 acres— *901 less than .4 percent of the Nation’s total land holdings. When part of the Nation’s land was flooded as a result of problems with a federal dam project, Congress enacted the Gila Bend Act in 1986 to “replace! ] • - • [Gila Bend Indian Reservation] lands with lands suitable for sustained economic use which is not principally farming....” Pub.L. No. 99-503, § 2(4) 100 Stat. 1798. Under this Act, the Nation assigned to the United States all rights and title to 9,880 acres of the Gila Bend Reservation for $30 million. Id. at § 4(a). The Nation was then authorized to purchase replacement land, and the Secretary was authorized to take 9,880 acres of replacement land into trust, which would create a new Indian reservation. Id. at § 6.
In 2002, the Nation, along with many other tribes, publicly supported Proposition 202 — a ballot measure designed to prevent construction of new casinos in Arizona cities. The Nation publicly asserted that it would not authorize additional Indian casinos in any cities.
Then in 2003, the Nation bought Parcel 2 within the City of Glendale through a series of complex transactions using a shell company with an out-of-state address. Parcel 2 is land that is physically within Glendale’s corporate limits, but as a “county island,” it is unincorporated land under the jurisdiction of Maricopa County. County islands stem from a once-common practice called “strip annexation.” This type of annexation occurs when a city “extend[s its] boundaries by annexing long strips of property” that encircle other, unincorporated areas. Republic Inv. Fund I v. Town of Surprise, 166 Ariz. 143, 800 P.2d 1251, 1254-55 (1990) (en banc).
The practical benefits a city enjoys once unincorporated land is surrounded by the city’s jurisdictional boundaries are twofold. First, cities are able to “exercise a strong degree of control over zoning and development” of county islands, because a city’s land-use planning documents and zoning ordinances are able to guide the zoning and subdivision of county islands. Carefree Improvement Ass’n. v. City of Scottsdale, 133 Ariz. 106, 649 P.2d 985, 986-87, 992 (Ariz.Ct.App.1982); Ariz.Rev. Stat. § 11-814(G) (“The rezoning or subdivision plat of any unincorporated area completely surrounded by a city or town shall use as a guideline the adopted general plan and standards as prescribed in the subdivision and zoning ordinances of the city or town after April 10, 1986.” (emphasis added)). Second, generally no other municipality can annex unincorporated land such as Parcel 2 that is within a city’s geographic limits. See Carefree Improvement Ass’n, 649 P.2d at 986; Ariz.Rev. Stat. § 9-101.01.
The City of Glendale’s exterior corporate boundary was extended to encircle Parcel 2 in 1977. Since that time, Glendale has controlled and guided the zoning and subdivision development of Parcel 2 and the surrounding land. Indeed, Parcel 2 is part of Glendale’s Municipal Planning Area and is included in Glendale’s General Plan. Currently, Parcel 2 has a rural zoning designation (R-43) that would allow only limited development.
The City of Glendale developed the surrounding area in reliance on its ability to control the zoning designation and land-use of Parcel 2 under this legal scheme. For instance, in 2005 Glendale finished building a new public high school directly across the street from what Glendale later learned was the Nation’s acreage. Glendale, as well as private parties, has also invested significant resources in the area by building a $450 million stadium, a $240 million arena, and a $120 million Major League Baseball training facility.
*902 In January 2009, the Nation transferred ownership of Parcel 2 to itself. Only days later, it filed its application asking the Secretary to take the property into trust and grant the Nation permission to establish a Class III, Las Vegas-style gambling facility. 25 U.S.C. § 2703. The Nation has advertised that this “new casino will be the largest in the state.” There are currently no gaming facilities within the City of Glendale. More than 30,000 people live within two miles of the proposed casino in what is currently described as a “family friendly” area.
B.
Pursuant to usual practices, the Department of Interior treated the Nation’s land-into-trust application as an ex parte filing. It never notified the public of the application, created a docket, set a pleading schedule, or held a hearing, because it was not required to do so under the notice and comment provisions of 25 C.F.R. §§ 151.10 and 151.11(d). Opponents of the application (who happened to be aware of the proceedings) were able to submit arguments against the application by letter only. Though the majority makes much of these “lengthy submissions,” Maj. Op. 891, the length of the letters submitted by these parties hardly improved the process by which these parties could contest the Secretary’s actions. The opposing parties were never alerted when the Secretary filed amendments to its application. Further, the State of Arizona did not even participate in this limited fashion.
In 2010, the Secretary concluded that Parcel 2 was eligible to be taken into trust under the Gila Bend Act. The Secretary determined that “the meaning of ‘corporate limits’ is plain” and “shows a clear intent to make property eligible under the Act if it is on the unincorporated side of a city’s boundary line.” The Department of Interior then published a Federal Register notice announcing its final determination “to acquire Parcel 2 consisting of 53.54 acres of land into trust for the Tohono O’Odham Nation....” 75 Fed.Reg. 52550-01, 52550 (Aug. 26, 2010). The Secretary has stayed the acquisition for litigation proceedings.
Plaintiffs sought review in district court. There, they raised both statutory and constitutional arguments that had been raised before the agency. The district concluded that the “within the corporate limits” phrase was “ambiguous” and applied Chevron deference to uphold the agency’s decision. See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[2] Plaintiffs sought an injunction to block the Secretary from taking Parcel 2 into trust during the appeal; the district court granted the injunction, concluding that Plaintiffs raised “difficult” and “substantial legal questions warranting more deliberative consideration on appeal.” The district court also concluded there would be irreparable harm, because Glendale would lose its right to annex the land if it were taken into trust, which would lead to “irreparable *903 quality-of-life injuries from gaming activities on Parcel 2.”[3]
II.
The majority concludes that the phrase “within the corporate limits” in the Gila Bend Act is “ambiguous,” and thus that deference was owed to the Secretary’s interpretation of an ambiguous statute. Maj. Op. 894-95. I disagree for two reasons.
A.
First, as the Supreme Court has held, “the susceptibility of [a] word ... to alternative meanings does not render the word whenever it is used, ambiguous, particularly where all but one of the meanings is ordinarily eliminated by context.” Carcieri v. Salazar, 555 U.S. 379, 390, 129 S.Ct. 1058, 172 L.Ed.2d 791 (2009) (alterations and internal quotation marks omitted). In Carderi, the Supreme Court ruled in favor of the State and prevented an Indian tribe from taking land into trust in the middle of a city by concluding that the statute was “clear.” Id. The Court arrived at this conclusion despite the conclusion of the court of appeals below that the statute was ambiguous.
Here, as in Carderi, the statutory context makes clear that “within the corporate limits” refers to land that is geographically enclosed in the jurisdictional limits of a city. Under the Gila Bend Act, the Secretary can only take land into trust upon the completion of certain statutory conditions, the most important of which are in Section 6(d) and relate to the size and location of land parcels:
The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection.... Land does not meet the requirements of this subsection if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or within the corporate limits of any city or town. Land meets the requirements of this subsection only if it constitutes not more than three separate areas consisting of contiguous tracts, at least one of which areas shall be contiguous to San Lucy Village. The Secretary may waive the requirements set forth in the preceding sentence if he determines that additional areas are appropriate.
Pub.L. No. 99-503, § 6(d) 100 Stat. 1798 (emphasis added).
Thus, the plain language of the Gila Bend Act makes clear that it was aimed at allowing the Nation to assemble new reservation land consisting of a few large tracts of land, none of which were within a city. While the Secretary could waive the contiguity and three-tract requirements where “appropriate,” the committee report indicates that Congress anticipated “appropriate” circumstances to include only those situations where parcels were “not entirely contiguous,” but were “sufficiently close to be reasonably managed as a single economic unit or residential unit.” H.R.Rep. No. 99-851, at 11 (1986). Parcel 2 is more than 100 miles from the Nation’s existing reservation. Nothing in the text of Section 6(d) anticipates that Arizona expected trust land to be purchased in little patches sprinkled throughout the State, and particularly not inside the exterior boundary of cities. Rather, the Gila Bend Act makes land ineligible to be taken *904 into trust if it lies physically inside, or within, the boundary, or limits of a city.
When there is “no evidence that the words ... have acquired any special meaning in trade or commerce, they must receive their ordinary meaning” based on “the common language of the people----” Nix v. Hedden, 149 U.S. 304, 306-07, 13 S.Ct. 881, 37 L.Ed. 745 (1893). The ordinary meaning of “within” is defined as “[i]n or into the inner part; inside.” The American Heritage Dictionary 1471 (1976). “Limit” means “the final or furthest confines, bounds, or restriction of something.” Id. at 758. Thus, Parcel 2 is within Glendale’s corporate limits, because it is “inside” the “final or furthest confines” or “bounds” of the City.[4] This is the obvious, plain meaning of the text that Congress likely understood when enacting Section 6(d) of the Gila Bend Act.
In contrast to this natural reading of the statute, the United States and the Nation argue that there are “two relevant boundaries: the city’s exterior boundary and the interior boundary,” and “only land that is between those two boundaries” is within corporate limits. Such an interpretation strains common sense, and is certainly not the obvious reading of the statute based on the “common language of the people.” Nix, 149 U.S. at 307, 13 S.Ct. 881. If Congress had wanted to refer to two boundaries, or to incorporated land only, it could have easily made that distinction.
Indeed, other statutes by Congress in similar circumstances indicate that, if Congress only wished to refer to a municipality’s incorporated or annexed land, it knew how to do so. See, e.g., 25 U.S.C. § 1724(i)(2)(allowing Indian tribe to use government-provided funds to purchase “acreage within ... unincorporated areas of the State of Maine” (emphasis added)); see also Pub.L. No. 102-402, § 4(d)(1), 106 Stat.1961, 1965 (1992) (referring to “annexation of lands within the refuge by any unit of general local government” (emphasis added)); Pub.L. No. 101-514, 104 Stat. 2074, 2076 (1991) (referring to “all incorporated units within the town of Matewan” (emphasis added)); Pub.L. No. 100-693, § 3(a), 102 Stat. 4559 (1988) (referring to “the incorporated area of the cities of Union City and Fremont” (emphasis added)). This contradicts the argument of the United States and the Nation that “within the corporate limits” means both within the exterior and the interior corporate limits of a city.
Furthermore, even if the “within the corporate limits” phrase does have a specific “settled meaning,” (as the United States and the Nation contend), the background legal norms, against which Congress is presumed to be aware when it legislates, most clearly supports the City of Glendale’s interpretation of the statute. The most relevant background legal norm to the Gila Bend Act is Arizona state law, because the Gila Bend Act only affects Arizona, and it is “a fair and reasonable presumption ... that [Cjongress” is aware of “state legislation” when the act of Congress has an effect on that law. See Prigg v. Commw. of Pa., 41 U.S. 539, 598-99, 16 Pet. 539, 10 L.Ed. 1060 (1842); see also Brock v. Writers Guild of Am., W., Inc., 762 F.2d 1349, 1358 n. 8 (9th Cir.1985) *905 (“[BJecause Congress is composed predominately of lawyers, court[s] may assume that Congress is aware of existing law.”).
Notably, Arizona’s zoning ordinances use the “within corporate limits” phrase in the geographical sense. For instance, Arizona Revised Statutes Section ÍM61.11 (A) allows a municipality to exercise its “planning powers” over “unincorporated territory” that is “within its corporate limits----” (emphasis added). See also id. § 9-462.07(A) (same).
The Arizona Supreme Court has also interpreted the words “corporate limits” to refer to a municipality's “exterior boundaries],” holding that a state university campus was located “within” the City of Flagstaff’s corporate limits, because it was “completely surround[ed]” by the “exterior boundary of Flagstaff.” Flagstaff Vending Co. v. City of Flagstaff 118 Ariz. 556, 578 P.2d 985, 987 (1978) (in banc). The court emphasized that “the ordinary meaning of ‘within’ ” is “on the innerside ... inside the bounds of a region.” Id. (internal quotation marks omitted) (quoting Webster’s Third New International Dictionary 2627 (1965)). Notably, the Arizona Supreme Court’s interpretation turned on the geographic location of the campus, not its jurisdictional status.
The majority’s attempt to distinguish this case, based on the fact that the campus had previously been annexed, is unavailing, because the campus’s jurisdictional status was irrelevant to the Arizona Supreme Court’s analysis. As a concurring justice observed, “[t]he record ... d[id] not make it clear whether the campus of Northern Arizona University is part of the City of Flagstaff.” Flagstaff Vending, 578 P.2d at 990 (Cameron, C.J., concurring). That justice was willing to concur in the opinion even if the land at issue was “beyond the corporate limits” of Flagstaff. Id. at 991.
While not binding on this court, Flagstaff Vending is persuasive authority that Congress understood “within the corporate limits” to refer to the geographic boundaries of a city when the Gila Bend Act was passed. This is particularly likely, because Flagstaff Vending was decided only eight years before two of Arizona’s representatives (Representative Morris K. Udall and then Representative John McCain) sponsored the Gila Bend Act.
Though the majority relies on situations where Congress has used the phrase “exterior boundaries,” these statutes are completely inapposite. Maj. Op. 895 (citing 16 U.S.C. § 485; 25 U.S.C. § 465). These statutes are in no way referring to unincorporated islands of land surrounded by an outer corporate limit, and thus there is nothing to indicate these statutes would have any bearing on this factually distinct situation. Rather, they merely refer to the “exterior boundary” of an area, such as a national forest. Furthermore, as discussed above, the Arizona Supreme Court had already interpreted “corporate limit[ ]” to be synonymous with “exterior boundary.” Flagstaff Vending Co., 578 P.2d at 987. It is likely that Congress also viewed these phrases as synonymous, so there is nothing significant about Congress using the “exterior boundaries” phrase in these statutes.
The Nation is correct that Arizona’s 1977 annexation ordinance “extended” the City of Glendale’s “present corporate limits ... to include” a strip of land surrounding Parcel 2. But that merely meant that the annexed strip then formed part of the “corporate limits.” The encircled land (Parcel 2) still fell within those limits. Nothing about this ordinance defined the term “within” in a way that would detract from this plain meaning.[5]
*906 Notably, in a 1992 Legal Brief, the Department of the Interior itself recognized that Section 6(d) created “geographical requirements” to take the land into trust only if it was “outside the corporate limits of any city or town.” Brief for Appellee at 4, Tohono O’Odham Nation v. Bureau of Indian Affairs, 22 IBIA 220 (I.B.I.A. Aug. 14, 1992). This position is directly contrary to the Department’s July 2010 position in this case that the “within the corporate limits” phrase is “jurisdictional in nature.”
“If the plain language of [the Act] renders its meaning reasonably clear,” the court “will not investigate further unless its application leads to unreasonable or impracticable results.” United States v. Fei Ye, 436 F.3d 1117, 1120 (9th Cir.2006) (internal quotation marks omitted). Therefore, because the meaning of the Act is clear at step one of the Chevron analysis, no deference is owed to the Secretary’s interpretation. See Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004) (“Even for an agency able to claim all the authority possible under Chevron, deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent.”).
B.
Even if the majority is correct that the statute is ambiguous, there is a second reason that the majority’s decision to defer to the Secretary is incorrect. The Supreme Court’s federalism canon of construction,[6] which operates at step one of *907 the Chevron analysis[7] as a normal tool of judicial interpretation,[8] makes clear that this court is required to interpret an ambiguous statute in favor of substantial state interests absent a clear indication that Congress intended otherwise. See SWANCC, 531 U.S. at 172-74; Pa. Dep’t. of Corr. v. Yeskey, 524 U.S. 206, 208-09, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998); BFP v. Resolution Trust Corp., 511 U.S. 531, 544-45, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994); Gregory v. Ashcroft, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410; see also Gonzales v. Oregon, 546 U.S. at 295-300, 126 S.Ct. 904(discussing the clear statement rule); Will v. Mich. Dep’t. of State Police, 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (“The language of § 1983 also falls far short of satisfying the ordinary rule of statutory construction that if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.” (internal quotation marks omitted)); United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) (“[Ujnless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.”). A discussion of the background justifications for this clear statement rule illustrates the relevance of this canon here.
The debate over what constitutes the appropriate balance of power between the states and federal government and — more relevant to this case — how that balance of power should be enforced, dates back to the founding of this nation. Regarding the specific interpretation that should be given to the Tenth Amendment, one position in this debate has been that it is the role of the judiciary to protect state interests by interpreting the Tenth Amendment as a substantive limit on federal power. The competing argument is that States are able to adequately protect their interests through the political process, so no additional judicial protections should be provided. Over the course of American history, *908 federal courts have not always taken consistent positions on this issue.[9]
For instance, prior to Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Supreme Court had, from time to time, employed the Tenth Amendment as a substantive limit on the federal government’s ability to exercise power.[10] The case of National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) was a Supreme Court case that used the Tenth Amendment in this manner.
In Garcia, the Court expressly overruled National League of Cities, because using the Tenth Amendment as a substantive limit on Congress proved “unworkable in practice,” even if it had some basis in Constitutional theory. 469 U.S. at 545-47, 105 S.Ct. 1005. The Court in Garcia did argue for judicial restraint when it came to rules that “look[ed] to the ‘traditional,’ ‘integral,’ or ‘necessary’ nature of governmental functions....” Id. at 546, 105 S.Ct. 1005. The Court also emphasized that States continue to “occupy a special and specific position in our constitutional system and that the scope of Congress’ authority under the Commerce Clause must reflect that position.” Id. at 556, 105 S.Ct. 1005.
However, the Court explained that the protection of State interests occurred through the political process and not the judiciary. “[T]he principal and basic limit on the federal commerce power is that inherent in all congressional action — the built-in restraints that our system provides through state participation in federal governmental action. The political process ensures that laws that unduly burden the states will not be promulgated.” Id. (emphasis added) The Court observed that “[i]n the factual setting of these cases the internal safeguards of the political process have performed as intended.” Id.
Only six years after Garcia, the Supreme Court apparently sought to strike a compromise between these competing positions when it decided Gregory v. Ashcroft, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410. There, the Court used the Tenth Amendment and federalism considerations as a rule of construction preventing federal laws from being interpreted in a way that burdened substantial state interests unless Congress clearly authorized such an interpretation of the law. The Court explained, “inasmuch as this Court in Garcia has left primarily to the political process the protection of the States against intrusive exercises of Congress’ Commerce Clause powers, we must be absolutely certain that Congress intended such an exercise.” 501 U.S. at 464, 111 *909 S.Ct. 2395; see also 1 Laurence Tribe, American Constitutional Law 1176 (3d ed. 2000) (“[T]o give the state-displacing weight of federal law to mere constitutional ambiguity would evade the very procedure for lawmaking on which Garcia relied to protect states’ interests.”).
In other words, to the extent that Garcia anticipated that States would be protected by “the internal safeguards of the political process” when the political process “performed as intended,” Gregory created a rule of construction aimed at ensuring that these political safeguards actually had “performed as intended” before significant state interests would be burdened. Garcia, 469 U.S. at 556, 105 S.Ct. 1005. Thus, the Gregory Court explained that Congress’s authority under the Supremacy Clause to preempt state law “in areas traditionally regulated by the States” is “an extraordinary power in a federalist system” that “we must assume Congress does not exercise lightly.” 501 U.S. at 460, 111 S.Ct. 2395.
A canon of construction favoring a State’s sovereign interests is not new. The Supreme Court has long explained that when federal law is arguably inconsistent with state law, courts must “start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.” Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).[11] However, the Supreme Court’s decision in Gregory appears to have transformed this presumption into a much more exacting clear statement rule requiring additional clarity from Congress.[12]
As the dissent in Gregory noted, to overcome a federalism presumption, Congress would be required both to make clear 1) that the statute was intended to extend “to the States” at all, and 2) Congress must also be clear as to whether “the precise details of the statute’s application” were meant to apply to the specific state activities at issue. 501 U.S. at 476, 111 S.Ct. 2395(White, J., dissenting).[13]
*910 Thus, even if the Gila Bend Act is, as the majority concludes, “ambiguous” and “less than crystal clear,” this only means that Congress never actually considered the issue of creating an Indian reservation on an unincorporated island within the geographic limits of a city. While statutory ambiguity in other contexts generally requires courts to defer to an agency’s interpretation, Chevron, 467 U.S. 887, 104 S.Ct. 2778, the federalism clear statement rule prevents Congress from punting this highly charged political decision to the less politically accountable agency, SWANCC, 531 U.S. at 172, 121 S.Ct. 675; Gregory, 501 U.S. 452, 111 S.Ct. 2395.[14]
For instance, in SWANCC, the agency specifically requested that Chevron deference be provided, because Congress “did not address the precise question of [the statute’s] scope with regard to nonnavigable, isolated, intrastate waters, and that, therefore, [the Court] should give deference to the [agency’s] ‘Migratory Bird Rule.’” 531 U.S. at 172, 121 S.Ct. 675. The Seventh Circuit had deferred to the agency’s interpretation after determining that the interpretation was “reasonable.” Id. at 166, 121 S.Ct. 675. However, the Court reversed the Seventh Circuit and explicitly stated that, “even were we to agree with respondents, we would not extend Chevron deference here.” Id. at 172, 121 S.Ct. 675. The Court invoked the federalism cannon of statutory interpretation and explained that its concern with the agency’s interpretation was “heightened where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power.” Id. at 173, 121 S.Ct. 675 (citing Bass, 404 U.S. at 349, 92 S.Ct. 515(“[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.”)). Thus, because the Court found “nothing approaching a clear statement from Congress that it intended” the statute to be applied as it was in the present case, the Court “read the statute as written to avoid the significant constitutional and federalism questions ... and therefore rejectfed] the request for administrative deference.” Id. (emphasis added).
Similarly, in Gregory, 501 U.S. 452, 111 S.Ct. 2395, the majority rejected the EEOC’s interpretation of the statute without even mentioning deference to the agency. It was only in Justice Black-man’s dissent where Chevron was discussed, and he argued that the Court should have deferred to the EEOC’s interpretation of a vague statute. Id. at 493, 111 S.Ct. 2395 (Blackmun, J., dissenting); see also Gonzales v. Oregon, 546 U.S. at 264, 274, 126 S.Ct. 904 (finding that the *911 Attorney General’s interpretive rule was “not entitle[d] ... to Chevron deference,” based on, inter alia, “background principles of our federal system”). In other words, in areas where federalism concerns are implicated, it appears that a clear authorization of Congressional authority is a preliminary requirement for any deference to be accorded to the agency’s interpretation of a statute.[15]
Contrary to the majority’s concerns about hypothetical applications of this rule, the federalism canon of construction does not preclude deference to any agency interpretation of “any and all ... federal legislation [that] could be construed to have at least minor, derivative implications for traditional state functions.” Maj. Op. 898. Rather, the Supreme Court has only applied this rule in narrow circumstances when the following three types of specific concerns arise. First, this rule has only been used by the Supreme Court in particular substantive legal “areas traditionally supervised by the States’ police power.” Gonzales v. Oregon, 546 U.S. at 274, 126 S.Ct. 904. The Supreme Court has demonstrated its commitment to protecting a State’s ability to regulate the land use and private property rights within its own territory. For instance, in SWANCC, the Supreme Court recognized that the agency’s interpretation would result in “a significant impingement of the States’ traditional and primary power over land and water use” as a justification for invoking the clear statement rule. 531 U.S. at 174, 121 S.Ct. 675; see also Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 44, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) (“[Regulation of land use [is] a function traditionally performed by local governments.”). Similarly, in BFP, 511 U.S. at 544-45, 114 S.Ct. 1757, the majority opinion invoked the Gregory clear statement rule in support of a reading that prevented federal law from trumping state law concerning the regulation of private property rights.
Second, the clear statement rule only applies when “a statute [is] susceptible of two plausible interpretations, one of which would have altered the existing balance of federal and state powers.” Salinas v. United States, 522 U.S. 52, 59, 118 S.Ct. 469, 474, 139 L.Ed.2d 352 (1997); see also United States v. Nordic Vill., Inc., 503 U.S. 30, 34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (applying a similar rule of construction where a was “susceptible of at least two interpretations,” one of which was more intrusive on a state’s interests). For instance, in Coeur Alaska, Inc. v. Southeast Alaska Conservation Council, 557 U.S. 261, 265, 273, 129 S.Ct. 2458, 174 L.Ed.2d 193 (2009), the clear statement rule did not apply, because the question was merely about which agency had authority to issue discharge permits, rather than whether an agency had authority to perform the action at all. Though the Court explained that the statute may be ambiguous, either interpretation had a similar effect on the State’s interests, and thus the Court deferred to the agency’s interpretation rather than applying the clear statement rule. Id. at 274-75, 129 S.Ct. 2458.
*912 In contrast, in Gregory, one interpretation of the ADEA would have allowed an agency to regulate retirement requirements for state judges — a significant intrusion on state interests, whereas the other interpretation would not allow such regulation. 501 U.S. at 469, 111 S.Ct. 2895. Similarly in SWANCC, the potential ambiguity in the Clean Water Act was over whether or not the Army Corps could regulate a land-locked, abandoned gravel pit “wholly located within two Illinois counties,” despite the fact that the agency did clearly have authority under the same statute to regulate other state land that “actually abutted on a navigable waterway.” 531 U.S. at 167, 171, 121 S.Ct. 675. The Court noted that, while the text of the Clean Water Act supported the latter interpretation, there was nothing to indicate that Congress had supported the former “more expansive” interpretation of “navigable waters.” Id. at 168-171, 121 S.Ct. 675. In other words, the type of ambiguity in the statute must be such that it is not clear that the State was able to protect its significant interests through the political process, because the State may not have been on notice that its important interests were at stake.
Third (and this factor applies only in the administrative context), the Supreme Court seems more likely to apply this clear statement requirement when the agency interprets the scope of its own statutory authority to regulate in the traditional state realm at issue. For instance, in Gonzales v. Oregon, the Supreme Court explained that it is a “commonsense conclusion” that “Ijjust as the conventions of expression indicate that Congress is unlikely to alter a statute’s obvious scope and division of authority through muffled hints, the background principles of our federal system also belie the notion that Congress would use such an obscure grant of authority to regulate areas traditionally supervised by the States’ police power.” 546 U.S. at 274, 126 S.Ct. 904. The Court thus explained that “[t]he idea that Congress gave the Attorney General such broad and unusual authority through an implicit delegation ... is not sustainable.” Id. at 267, 126 S.Ct. 904. The Court quoted Whitman v. American Trucking Associations, Inc., 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001), where it had previously explained that “Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes.” Id.[16]
This concern regarding the agency’s interpretation of its own statutory authority compounds when the agency’s interpretation of the authority-granting statute itself strains the bounds of Congress’s constitutional authority. For example, in SWANCC, the Court explained that “[wjhere an administrative interpretation of a statute invokes the outer limits of Congress’ power, we expect a clear indica *913 tion that Congress intended that result.” 531 U.S. at 172, 121 S.Ct. 675. The Court explained that this concern stems from the “assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority.” Id. at 172-73, 121 S.Ct. 675. However, while constitutional limits may heighten concerns about authority, clear statement rules “cannot be defended as a simple invocation of the rule about avoiding serious constitutional questions,” because these rules apply even in situations where, “if Congress acted with the requisite clarity, the statute would be constitutional.” William N. Eskridge, Jr., et al., Legislation and Statutory Interpretation 368 (2d ed.2006).
Under this third concern, the federalism clear statement rule is satisfied when a statutory grant of authority to an agency is without reservation and clearly encompasses the scope of the subject matter. See Yeskey, 524 U.S. at 208-210, 118 S.Ct. 1952. But when there is some reservation of authority and it is not clear if the agency’s interpretation is statutorily authorized, the clear statement rule applies in full force. SWANCC, 531 U.S. at 172-74, 121 S.Ct. 675; Gregory, 501 U.S. 452, 111 S.Ct. 2395; see also Gonzales v. Oregon, 546 U.S. at 295-300, 126 S.Ct. 904.
All three of the specific concerns related to the federalism canon are present in this case. First, the Secretary’s interpretation of the Gila Bend Act clearly implicates Arizona’s “traditional and primary power over land ... use” and private property rights within its territory. See SWANCC, 531 U.S. at 174, 121 S.Ct. 675. I am surprised by the majority’s argument that no “encroachment on state power” is at issue in this case. Maj. Op. 898 (emphasis added). Although the City of Glendale is a municipality, in SWANCC, the land at issue was only a “municipal landfill,” and yet the Supreme Court still determined that the federal government’s attempt to regulate this land constituted “a significant impingement of the States’ traditional and primary power.” Id. at 173-74, 121 S.Ct. 675 (emphasis added). Moreover, as discussed below, it is Arizona’s state-wide zoning scheme created under Arizona state law (a scheme that allows cities to develop and lay claim to land enclosed within a cities corporate limits, even if that land is not incorporated) that will be interrupted by the Secretary’s application of the Gila Bend Act in this case. It is Arizona state citizens that will be affected by Parcel 2 being taken into trust just across the street from their neighborhoods. It is also land located within Arizona’s “own territory” that will be effectively transferred to another sovereign. Green v. Biddle, 21 U.S. at 43. Even the Federal Government’s brief recognizes that “jurisdiction over Indian lands involves ‘an accommodation between the interests of the Tribes and the federal government, on the one hand, and those of the State, on the other.’ ” Federal Appellees’ Answering Br. 48 (emphasis added) (quoting Nevada v. Hicks, 533 U.S. 353, 361-62, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001)). The Federal Government’s brief also notes that the Secretary’s decision to take Parcel 2 into law will result in a “[displacement of state law....” Id. at 50 (emphasis added).
The majority’s argument that Arizona never “articulated a state sovereignty or constitutional interest vis-a-vis § 6(d)” also “puzzled” me. Maj. Op. 898. Arizona clearly argued (multiple times throughout both the opening and reply brief) that the Gila Bend Act, which includes Section 6(d), “as applied violates the Tenth Amendment” and invades “essential attributes inhering in [Arizona’s] sovereign status.” Arizona Appellants’ Opening Br. 49, 51. All parties were also ordered by our panel *914 to discuss the application of the federalism clear statement rule to this case at oral argument, at which time Arizona argued that the clear statement rule specifically applies to an interpretation of Section 6(d), and state sovereignty concerns require construing any ambiguity in the Gila Bend Act in Arizona’s favor.[17] I do not address Arizona’s argument that the Tenth Amendment and state sovereignty concerns create a substantive constitutional limit that prevents the Secretary from “tak[ing Parcel 2] into trust in the first place,” Arizona Appellants’ Reply Br. 27, nor do I address Arizona’s other concerns with the Gila Bend Act and the Secretary’s interpretation of it, because I conclude that the federalism canon’s procedural requirement for added clarity, as applied to Section 6(d)’s language alone, requires a ruling for Arizona and Glendale.
Second, the statutory interpretation debate over the Gila Bend Act is over one interpretation that would significantly burden Arizona’s substantial state interests and another interpretation that is much less intrusive. The Secretary’s application of the Gila Bend Act would interfere with Arizona’s sovereign powers more than the typical creation of an Indian reservation, regardless of whether a casino is ever actually built on Parcel 2. It is a commonsense conclusion that a state has a greater concern about how land within its cities is used than land outside its cities. SWANCC, 531 U.S. at 167, 171, 121 S.Ct. 675 (recognizing a heightened concern over land “wholly located within two Illinois counties” compared to land that “actually abutted on a navigable waterway”).
Furthermore, ordinary land use concerns are heightened by the fact that in Arizona, municipalities expect to be able to “exercise a strong degree of control over zoning and development” over land within their geographic boundaries, even if the land is not incorporated. Carefree Improvement Ass’n., 649 P.2d at 987; Ariz. Rev.Stat. § 11-814(G). A city’s land-use planning documents and zoning ordinances are able to guide the zoning and subdivision of county islands. Carefree Improvement Ass’n, 649 P.2d at 986-987, 992. In addition, in Arizona, generally no other municipality can annex unincorporated land such as Parcel 2 that is within a city’s geographic limits. Id. at 986; Ariz.Rev. Stat. § 9-101.01; see also Kane v. City of Beaverton, 202 Or.App. 431, 122 P.3d 137, 142 (2005) (“[T]here are a number of rational and legitimate reasons for disparate treatment of ‘island’ territories....”). Thus, Glendale had reasonable expectations that it would be able to guide and control Parcel 2’s development, and that this land could not be claimed by any other entity capable of changing the land use development. In reliance on this zoning scheme, the City of Glendale zoned Parcel 2 as residential and developed the surrounding area consistent with that zoning designation. These reliance interests *915 would not exist to the same extent in the hypothetical the majority poses, regarding “acquiring land in trust immediately adjacent to a city’s outermost boundary or even land that was almost, but not entirely encircled by corporate land.”[18] Maj. Op. 898.
The State’s territorial control — the ability to tax, to regulate, and to control land use — is effectively eliminated when state land is taken into trust. As courts have noted, “federally-recognized reservations ... are, in many ways, separate jurisdictions from the state in which they are located.” Tworek v. United States, 46 Fed.Cl. 82, 87 (2000). Importantly for this case, tribal sovereignty blocks “state action that impairs the ability of a tribe to exercise traditional governmental functions such as zoning ... or the exercise of general civil jurisdiction over the members of the tribe.” Crow Tribe of Indians v. Montana, 650 F.2d 1104, 1110 (9th Cir. 1981) (emphasis added); see also Segundo v. City of Rancho Mirage, 813 F.2d 1387, 1390-94 (9th Cir.1987) (rejecting a State’s attempts to apply local laws such as zoning ordinances to reservation lands). The Supreme Court has explained that one of the independent “barriers to the assertion of state regulatory authority over tribal reservations and members” is the sovereign “right of reservation Indians to make their own laws and be ruled by them.” White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980); see also United States v. Wheeler, 435 U.S. 313, 322, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (“The powers of Indian tribes are, in general, inherent powers of a limited sovereignty which has never been extinguished.”). Thus, upholding the Secretary’s interpretation would strip Glendale of its long-standing authority to control land use on Parcel 2 and transfer that control to a separate sovereign.
The transfer of Arizona’s sovereign authority, over land enclosed within one of its major cities, is a significant encroachment on Arizona’s state interests, regardless of how Parcel 2 is ultimately developed. Moreover, the fact that taking Parcel 2 into trust would create the very real potential that a new casino would be built across the street from a high school, a quarter-mile from churches, and within Glendale’s carefully developed residential area (where millions of dollars have been invested) understandably heightens the State’s concerns.
Furthermore, not only would the Secretary’s decision affect the State’s ordinary land use powers, the agency’s decision here will likely implicate major budgetary decisions. For example, if a casino is built, city officials estimate that the casino complex will require Glendale to build significant additional infrastructure in the area (e.g., fire, police, etc.), as well as to spend millions of additional dollars of expenditures for public safety outlays. The Supreme Court has explained that “[f]ederalism concerns are heightened when, as in these cases, a federal court decree has the effect of dictating state or local budget priorities.” Horne v. Flores, 557 U.S. 433, 448, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009).
*916 The political process justifications for the federalism clear statement rule are also particularly relevant here. In contrast to Garcia, "[i]n the factual setting of [this case] the internal safeguards of the political process” have not “performed as intended.” Garcia, 469 U.S. at 556, 105 S.Ct. 1005. As discussed above, the text of the Gila Bend Act readily lends itself to an interpretation that would prevent any reservations from being created within the geographic boundaries of a city. Thus, when two of Arizona’s own representatives sponsored the Gila Bend Act in the House of Representatives, there was nothing from the text of the statute that would have alerted Arizona to the fact that it was consenting, through the political process, to legislation that would be adverse to its significant state interests. Indeed, the Arizona Supreme Court’s recent decision in Flagstaff Vending, 578 P.2d at 987, as well as Arizona’s zoning ordinances discussing unincorporated territory “within the corporate limits,” Ariz.Rev.Stat. § 9-461.11(A); id. § 9-462.07(A), likely reinforced Arizona’s understanding that land like Parcel 2 would not be eligible to be taken into trust.
To further complicate Arizona’s dilemma, when the Department of Interior was considering the Nation’s land-into-trust application, Arizona did not participate in this ex parte filing and had no way to formally do so. There was no public notification, no docket, no pleading schedule, and no hearing for interested parties. Opponents of the application who happened to be aware of the proceedings were able to submit arguments against the application by letter only, but they were not alerted when the Secretary filed amendments to its application. Thus, the statutory interpretation tools and facts of this case indicate that the ambiguity at issue in the “within the corporate limits” phrase was of the type that prevented Arizona from adequately protecting its state interests through the political process.
Third and lastly, the Secretary’s interpretation here concerns the scope of its own authority to take this land into trust. While the Gila Bend Act clearly provides authority for the Secretary to take land into trust to create Indian reservations in certain locations, this grant of authority is based on significant limitations, including that such reservations not be created “within the corporate limits” of a city. The majority concedes that the Gila Bend Act is “ambiguous” regarding whether the “within the corporate limits” language was meant to authorize the Secretary’s action of taking Parcel 2 into trust. Maj. Op. 894. As in Gregory, SWANCC, and Gonzales v. Oregon, courts should not defer to an agency’s interpretation of an ambiguous grant of authority when the interpretation buts up against the limit of the agency’s own authority. This is especially true where such an interpretation may also press the outer limits of Congress’s authority under the Indian Commerce Clause. See United States v. Lara, 541 U.S. 193, 205, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004) (indicating that Congress could run up against “constitutional limits” if its Indian legislation “interfere[d] with the power or authority of any State”).
Therefore, even assuming the Gila Bend Act is ambiguous, ambiguity of this nature can only be interpreted in a State’s favor. Though the majority is correct that this “case illustrates the nuances of our federalist system of government,” Maj. Op. 889, the majority misunderstands that Arizona’s sovereign interests must prevail in this case, and this court is precluded from applying Chevron deference to the Secretary’s interpretation. The majority’s ruling to the contrary eviscerates the very political protections on which the Supreme Court relied when it decided in Garcia *917 that States can protect their sovereign interests through the political process.
III.
Because both the plain language of the Gila Bend Act and the canon of construction favoring a State’s interests requiring an interpretation of “within the corporate limits” contrary to that of the Secretary, I must respectfully dissent.

. Carcieri v. Kempthorne, No. 07-526, Oral Arg. Tr. 36:13-17 (Nov. 3, 2008).

. The majority says that the district court "conclud[ed] that the Secretary of the Interior correctly applied the” Gila Bend Act. Majority Op. 889. This is a slight misstatement. The district court found "the meaning of ‘within the corporate limits’ to be ambiguous” in the Gila Bend Act. Gila River Indian Cmty. v. United States, 776 F.Supp.2d 977, 987 (D.Ariz.2011). After conducting its own analysis and finding both parties' interpretation plausible, the district court contemplated what it must do when "both sides advocate reasonable interpretations” and concluded that it "must defer to the agency’s interpretation.” Id. at 989. Thus, the court deferred to the agency’s interpretation because it was reasonable, but it did not necessarily find that it was the correct interpretation.

. The district court also enjoined Glendale from annexing Parcel 2 to preserve the status quo.

. In its cross motion for summary judgment, the United States also agreed to the Black's Law Dictionary definition "within" and "limit.” "Within” is defined as ”[i]n inner or interior part of.” Black’s Law Dictionary 1602 (6th ed.1990). "Limit” is defined as "[b]oundary, border, or outer line of a thing.” Id. at 926. These definitions also support a plain meaning interpretation of the Gila Bend Act supporting the City’s interpretation, because Parcel 2 is in the "inner or interior part of” the City's "[b]oundary, border, or outer line.”

. The majority cites to Arizona Revised Statutes Section 9-500.23, a non-zoning ordinance about fire and safety, which "outside corporate limits” in a jurisdictional sense. However, the jurisdictional usage makes sense in this context, because which entity is authorized to provide fire and safety services is an issue of authority and jurisdiction. In fact, this ordinance is entitled "Authority to provide fire protection and emergency services outside corporate limits.” Thus, the jurisdictional nature of the "corporate limits” phrase used there is distinguishable from the geographic nature of the phrase used in a zoning context, and the majority's reliance on this ordinance is misplaced.
Other state cases interpreting identical "within the corporate limits” language have come to the same conclusion as the Supreme Court of Arizona. See, e.g., Village of Frankfort v. Ill. EPA, 366 Ill.App.3d 649, 304 Ill. Dec. 272, 852 N.E.2d 522, 524 (2006) (referring to unincorporated land "within the corporate limits of Frankfort”); City of Des Moines v. City Dev. Bd., 335 N.W.2d 449, 450 (Iowa Ct.App.1983) (city "notified respondent ... that the city would not provide essential services to isolated unincorporated areas within the corporate limits of the city”); Town of Germantown v. Village of Germantown, 70 Wis.2d 704, 235 N.W.2d 486, 491 (1975) (interpreting statute as giving municipalities an opportunity to annex islands “lying within the corporate boundaries”).

. The United States argues that the Indian canon of construction, requiring a liberal interpretation of statutes in favor of Indians, requires a ruling for the Nation if the Gila Bend Act is ambiguous. See Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). However, the district court found that the Secretary’s interpretation would adversely affect the economic interests of other Indian tribes in Arizona. This canon does not appear to apply when it will benefit one tribe at the expense of other Indian tribes. See Confederated Tribes of Chehalis Indian Reservation v. Washington, 96 F.3d 334, 340 (9th Cir.1996) (declining to apply canon where multiple tribes dispute fishing rights); see also Northern Cheyenne Tribe v. Hollowbreast, 425 U.S. 649, 655 n. 7, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976) (declining to apply canon because the "contesting parties are an Indian tribe and a class of individuals consisting primarily of tribal members”).
Furthermore, Supreme Court precedent suggests that when the Indian canon conflicts with the federalism canon, the federalism *907 canon prevails. See, e.g., William N. Eskridge, Jr. et al., Legislation and Statutory Interpretation 374-75 (2d ed. 2006) (“[T]he canon promoting interpretations favoring Native Americans has weakened considerably in recent years, in the aftermath of jurisdictional disputes where states have prevailed over tribes.” (citing South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998); Blatchford v. Native Village of Noatak, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991); Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989)); Philip P. Frickey, A Common Law for Our Age of Colonialism: The Judicial Divestiture of Indian Tribal Authority over Nonmembers, 109 Yale L.J. 1 (1999)); William N. Eskridge, Jr. & Philip P. Frickey, Quasi-Constitutional Law: Clear Statement Rules As Constitutional Lawmaking, 45 Vand. L.Rev. 593, 628 (1992) (“Gregory, and the federal criminal cases also may have dramatically deflated the longstanding canon presuming that states have no regulatory role in Indian country.”).

. Generally, “canons of interpretation are considered to be part of the traditional tools available to the Court at Step One” of the Chevron analysis. See William N. Eskridge, Jr. et al., Legislation and Statutory Interpretation 335 (2d ed.2006); see also Kenneth A. Bamberger, Normative Canons in the Review of Administrative Policymaking, 118 Yale L.J. 64, 77 (2008) ("The largest group of cases to consider the place of normative canons in review of agency interpretations treats them as the type of ‘traditional tools' that courts may use to resolve textual ambiguity, even when faced with an agency construction that might otherwise be entitled to deferential Chevron review.”).

. "In determining if Congress has 'an intention on the precise question at issue,’ [the Court] employ[s] ‘traditional tools of statutory construction.’ ” Hamilton v. Madigan, 961 F.2d 838, 840 n. 3 (9th Cir.1992) (quoting Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. 2778).

. Compare Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918) (holding that a federal law prohibiting interstate shipment of goods that utilized child labor violated the Constitution, because "[t]he power of the States to regulate their purely internal affairs by such laws as seem wise to the local authority is inherent and has never been surrendered to the general government”); Bailey v. Drexel Furniture Co., 259 U.S. 20, 38, 42 S.Ct. 449, 66 L.Ed. 817 (1922) (same), with United States v. Darby, 312 U.S. 100, 124, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (holding that a federal law prohibiting shipment of goods made by children was Constitutional, because the Tenth Amendment was merely a reminder that "all is retained which has not been surrendered”).

. See, e.g., Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936) (invalidating the Bituminous Coal Conservation Act of 1935 on federalism grounds); United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936) (striking down part of the Agricultural Adjustment Act that imposed taxes on agricultural processors under the Tenth Amendment).

. See also Employees of the Dep’t of Pub. Health & Welfare v. Dep’t. of Pub. Health & Welfare, 411 U.S. 279, 284-85, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973); Bass, 404 U.S. at 349, 92 S.Ct. 515.

. See William N. Eskridge, Jr. et al., Legislation and Statutory Interpretation 368 (2d ed.2006); Note, Federalism — Clear Congressional Mandate Required to Preempt State Law: Gregory v. Ashcroft, 105 Harv. L.Rev. 196, 201-02 (1991) (“The Court has long required Congress to state clearly its intent to upset the usual balance of power between the states and the federal government.... Gregory’s plain statement rule, however, represents a new, more exacting rule of statutory construction.”).

. See also Federalism — Clear Congressional Mandate Required to Preempt State Law: Gregory v. Ashcroft, supra note 11, at 202 ("In Gregory, the Court created a two-tier inquiry. First, Congress must clearly intend to extend a law to the states.... Second, Congress must delineate which specific state governmental functions it wishes to include within the sweep of the federal law.”).
That this two-tier analysis exists is demonstrated by the fact that the Supreme Court has upheld the imposition of the exact same federal statute against states in some instances where the statute's application was clear, but not in other instances where the statute’s application was less than clear. For example, in SWANCC, 531 U.S. at 162, 121 S.Ct. 675, the statutory interpretation question was whether an abandoned sand and gravel pit constituted “navigable waters,” as interpreted by the United States Army Corps of Engineers. The Supreme Court struck down the application of the "navigable waters” provision in the Clean Water Act to a land-locked gravel pit in one instance. 531 U.S. at 162, 121 S.Ct. 675("We are asked to decide whether the provisions of § 404(a) may be fairly extended to these waters.... ” (emphasis added)). This was because, though it was clear that the Clean Water Act could be applied by *910 agencies against the states in general, the intrusive application in SWANCC was not clearly authorized by Congress in that case, where the application raised heightened federalism concerns. But the Court noted that, in United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 134, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Court upheld the application of the exact same statute to water that was adjacent to and "inseparably bound up with” navigable waters. Id. at 167, 121 S.Ct. 675.
Similarly, in Gregory, the Supreme Court struck down the application of the ADEA to potentially include retirement requirements on state judges. 501 U.S. 452, 111 S.Ct. 2395. But in Kimel v. Florida Bd. of Regents, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000), the Supreme Court found the same statute, the ADEA, satisfied the clear statement rule regarding Congress’s intention to abrogate states’ Eleventh Amendment immunity.

. Clear statement canons "trump Chevron," because "Executive interpretation of a vague statute is not enough when the purpose of the canon is to require Congress to make its instructions clear.” Bamberger, supra note 6, at 80(quoting Cass R. Sunstein, Nondelegation Canons, 67 U. Chi. L.Rev. 316, 331 (2000)).

. Clear statement "canons reflect a singular requirement that certain important issues be addressed by legislative deliberation alone. More specifically, they operate as clear statement rules that bar the interpretation of a statute to push the bounds of federal power absent an unambiguous declaration of intent by Congress." Bamberger, supra note 6, at 79 (citing Cass R. Sunstein, Beyond Marbury: The Executive's Power To Say What the Law Is, 115 Yale L.J. 2580, 2607 (2006)). The canons also “force a democratically elected Congress to deliberate on, and then raise, a question via explicit statement by operating in a manner that constrains any interpretive discretion on the part of courts and agencies.” Id. at 80.

. See also Wyeth v. Levine, 555 U.S. 555, 576-77, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (the Court gave no weight to the agency's conclusion that state law is pre-empted); FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 160, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.”); Robin Kundis Craig, Administrative Law in the Roberts Court: The First Four Years, 62 Admin. L.Rev. 69, 171 (2010) (“The Roberts Court’s track record to date indicates that it will generally accord far less deference to a federal agency when the agency is determining the scope of its own jurisdictional authority. This inclination is particularly strong when the agency is expanding its authority into realms that the Court perceives as the states’ — for example, regulation of doctors, retention of legal authority over land, and land-use planning." (emphasis added)).

. It is worth noting that, in BFP, 511 U.S. 531, 114 S.Ct. 1757, the Supreme Court invoked the clear statement canon in favor of the State despite the fact that neither the Ninth Circuit nor any party had discussed the clear statement rule. Our precedent is also clear that, even if Arizona did make a concession about a question of law, there is “no reason why we should make what we think would be an erroneous decision, because the applicable law was not insisted upon by one of the parties." United States v. Miller, 822 F.2d 828, 832 (9th Cir.1987) (quoting Smith Engineering Co. v. Rice, 102 F.2d 492, 499 (9th Cir.1938)). "The rule has been repeated in a variety of circumstances. Even if a concession is made by the government, we are not bound by the government’s ‘erroneous view of the law.’ " Id. (quoting Flamingo Resort, Inc. v. United States, 664 F.2d 1387, 1391 n. 5 (9th Cir.1982)). This is particularly true where all parties had the chance to address this issue at oral argument.

. Furthermore, the question of whether land immediately adjacent to Parcel 2 and outside Glendale’s city limits could be taken into trust is not a question before this court, given that it is not clear whether such land would meet other requirements of the Gila Bend Act, including that the land be "three separate areas consisting of contiguous tracts, at least one of which areas shall be contiguous to San Lucy Village,” Pub.L. No. 99503, § 6(d) 100 Stat. 1798, or else that non-contiguous parcels are "sufficiently close to be reasonably managed as a single economic unit or residential unit.” H.R.Rep. No. 99-851, at 11 (1986).